305 Ga. 467
FINAL COPY

S18A1467. WEST v. THE STATE.

ELLINGTON, Justice.

Following a jury trial, Reco Dehaven West a/k/a Rico Dehaven West, was found guilty of malice murder and other offenses arising out of a home invasion that resulted in the shooting death of Nicolas Jackson II.[1] On appeal, West contends that the trial court erred in admitting evidence that he conspired and attempted to improperly influence a juror in his trial. He also claims that the evidence was insufficient to enable a rational trier of fact to find him guilty beyond a reasonable doubt of armed robbery and of felony murder predicated

---

[1] Nicolas Jackson II was killed on February 2, 2012. On March 20, 2014, West was indicted for malice murder, four counts of felony murder (predicated on armed robbery, aggravated assault, burglary, and possession of a firearm by a convicted felon), armed robbery, aggravated assault, burglary, and possession of a firearm by a convicted felon. The indictment also included a count of criminal gang activity that was nolle prossed. West's co-defendant, Michael Davis, was named in the same indictment, and charged with similar offenses, but Davis's case was severed during the trial. Following a May 5-14, 2014 trial, the jury found West guilty on all counts. On May 15, 2014, the trial court sentenced West to life in prison without the possibility of parole on the malice murder count. The trial court did not sentence West on any other count. See Division 1, infra. West filed a motion for new trial on May 21, 2014, which he amended on April 14, 2016. The court entered its order denying the amended motion for new trial on April 4, 2018. West's timely appeal was docketed in this Court to the August 2018 term and submitted for decision on the briefs.

on the armed robbery. For the reasons set forth below, we affirm.

Viewed in a light most favorable to the verdict, the evidence shows the following. On the afternoon of February 2, 2012, Nicolas and his sister, Nikia Jackson, drove from school to their Gwinnett County residence. No one else was home. After they entered through the basement door, Nicolas went to his room in the basement, and Nikia went to her room upstairs. While she was watching television, Nikia heard what she thought was the sound of a bouncing basketball. She left her room and called for her brother, but she heard no response.

When Nikia got to the living room on the main floor, she looked out the window and saw a van full of men. Another man carrying a black bag got into the vehicle, which sped away. Nikia found Nicolas lying against his bedroom door, bleeding and not speaking. The day after the shooting, Nikia identified West from a photographic lineup as one of the men in the van.

A lieutenant with Gwinnett County fire emergency services responded to a 911 call from the Jackson home, where he discovered that Nicolas had no pulse and was not breathing. His attempt at CPR was unsuccessful. According to the medical examiner, Nicolas died as a result of a gunshot wound to the

chest.

Apparently as a result of Nikia's 911 call, a City of Norcross police officer was advised of a burglary in process at the Jackson home and that a silver van was being used in the burglary. En route to the Jackson home, the officer saw, and then followed, a silver van. The van stopped after the officer activated his blue lights and turned on his siren. Two men, West and Anthony Lumpkin, got out and ran. When backup arrived, officers ordered the four men who remained in the van out of the vehicle and then placed them in handcuffs. Another responding officer located and arrested West and Lumpkin.

Timothy Johnson, the driver of the van, testified at West's trial after entering a negotiated plea of guilty to charges related to the shooting. According to Johnson, a cocaine dealer named Kevell Ross wanted Johnson to find someone to burglarize the Jackson residence with the understanding that Ross would take 15% of the proceeds. Ross promised they would find at least $1 million in cash.

Johnson further testified that he and Darrez Chandler, Jason Dozier, Lumpkin, and Eddie Green were involved with planning the burglary. After they conducted surveillance of the residence, and following an aborted attempt in

3

December 2011, Dozier called Johnson on February 2, 2012, and told him that he and Chandler were "going back up there this morning." Johnson then met with Dozier, Chandler, and Lumpkin. Green arrived with the van, and Johnson eventually agreed to drive.

According to Johnson, he and Green left to pick up the "young guys" to assist in the crime. West and his co-defendant, Michael Davis, got into the van when they pulled up. West and Davis were both armed, and Lumpkin had already told them about the planned burglary.

Johnson further testified that he drove to the Jackson residence with West, Davis, Dozier, Lumpkin, and Green in the van. Chandler drove a Pontiac and served as a lookout. When they arrived, West, Davis, Dozier, and Lumpkin got out of the van and walked down the driveway to the basement door. Johnson circled the block, and he heard gunfire when he came back to the house. He quickly circled around a second time, and, before he could stop the van, he saw the four men exiting the home and running toward him. Dozier was carrying a laptop computer bag. After the men got in the van, Lumpkin said that he "had to shoot" someone inside the house. Shortly thereafter, a police car followed the van and activated its blue lights. When Johnson stopped, he saw his passengers

4

handing guns to Green, who threw them out of the vehicle.

A Smith & Wesson .40 caliber handgun and a Jiminez Arms 9 mm handgun were discovered on the ground in the vicinity of the van. Police found two more handguns, including a Kel-Tec .380, inside the van, as well as a laptop computer taken from the Jackson residence.

Following the arrest of West, Davis, Dozier, Green, Johnson, and Lumpkin, an officer used gunshot residue kits on them. Examination of the kits by the Georgia Bureau of Investigation ("GBI") showed gunshot residue on West, Davis, Dozier, and Lumpkin, the four men identified by Johnson as having entered the Jackson residence. The kits did not show gunshot residue on Johnson or Green.

Nine millimeter and .380 shell casings were recovered from inside the Jackson home. Investigators found that the basement door of the Jackson home had been kicked in from outside, and that there was a shoe impression on the door. That shoe print was consistent with Lumpkin's shoes. Dozier's DNA and fingerprints were found on the Kel-Tec .380. The testimony of a GBI firearms examiner showed that the bullet recovered from Nicolas's body was fired by the Jiminez Arms 9 mm.

5

The State introduced recordings of several incriminating telephone calls made by West while he was in jail. In one call, West spoke with a man who identified himself as Ball. Before the call recording was played for the jury, a detective testified that the parties to the call used "condom" as a coded reference for gun. Johnson had previously testified that Lumpkin was known as "Cat Eyes." During the call, after Ball asked about the "little homie," West explained, in apparent reference to the victim, that "[h]e closed the door and then Cat Eyes put the condom on him . . . . [Cat Eyes] just assumed another condom was busting back[.]"

At trial, West stipulated that he had previously been convicted of a felony. He chose not to testify and called no witnesses in his defense.

1. (a) In accordance with this Court's standard practice in appeals of murder cases, we have reviewed the record and find that the evidence was sufficient to enable a rational trier of fact to find West guilty beyond a reasonable doubt of malice murder. *Jackson v. Virginia*, 443 U. S. 307 (99 SCt 2781, 61 LE2d 560) (1979).

(b) West claims that the evidence adduced as to Counts 2 and 7, charging him with felony murder predicated on armed robbery and armed robbery,

6

respectively, was insufficient to find him guilty of those offenses.

(i) Count 2, felony murder predicated on armed robbery, was vacated by operation of law because West was found guilty of the crime of malice murder. See *Lucky v. State*, 286 Ga. 478, 480 (2) (689 SE2d 825) (2010); *Malcolm v. State*, 263 Ga. 369, 372-373 (5) (434 SE2d 479) (1993). It follows that this claim of error is moot as to Count 2.  See *Mills v. State*, 287 Ga. 828, 830 (2) (700 SE2d 544) (2010) (where felony murder conviction was vacated by operation of law, claim of insufficient evidence to support that conviction was moot).

(ii) The trial court did not sentence West on Count 7, armed robbery. Rather, the trial court merged the armed robbery count into Count 2, felony murder predicated on armed robbery.[2] This was error inasmuch as "there is no felony murder count into which the underlying felony can merge, since the felony murder conviction has been statutorily vacated." *Malcolm*, 263 Ga. at 373 (5). The pertinent issue is instead whether the armed robbery count (and the other underlying felonies for which West was found guilty) merged into the malice

---

[2] The trial court also merged the aggravated assault, burglary, and possession of a firearm by a convicted felon counts into the corresponding counts of felony murder.  The court merged the four counts of felony murder into the count of malice murder, the only count for which West was sentenced.

murder count. Id. at 374 (5).

Nevertheless, "we have determined that, when a merger error benefits a defendant and the State fails to raise it by cross-appeal, we henceforth will exercise our discretion to correct the error upon our own initiative only in exceptional circumstances." *Dixon v. State*, 302 Ga. 691, 698 (4) (808 SE2d 696) (2017) (footnote omitted). In this case, any merger errors were to West's benefit, the State has not filed a cross-appeal, and we see no exceptional circumstances that would warrant the exercise of our discretion to correct the errors. Because the trial court did not sentence West on the armed robbery count, and the court's judgment will stand, West's claim that the evidence was insufficient to support the jury's verdict on the count of armed robbery is moot. See, e.g., *Lupoe v. State*, 284 Ga. 576, 577, n.2 (669 SE2d 133) (2008) (a claim of insufficient evidence to support a conviction that has been merged into another conviction is moot).

2. West contends that the trial court erred in admitting evidence that he conspired and attempted to improperly influence a juror in his trial. For the following reasons, we find no error.

The record shows that on Monday morning, May 12, 2014, the

commencement of the second week of West's trial, the prosecutor announced that he wished to bring certain matters to the court's attention before the trial resumed. Testimony of a City of Norcross police department detective outside the presence of the jury showed that the detective had been monitoring West's jail phone calls. After the detective realized that West and Cameron Kemp, West's podmate,[3] had been calling certain phone numbers in common, he began to monitor Kemp's phone calls as well. The detective listened to the recordings of two May 10, 2014, phone conversations between Kemp and Angella Hodges, Kemp's mother, after which the detective alerted the prosecutor.

Our review of the recordings of the two phone calls at issue, which were played for the trial court and later admitted into evidence, shows the following. In the first phone call, Hodges asked Kemp about West, and Kemp responded that West was next to him. Kemp directed Hodges to create a "fake" Facebook page, using false information and a photograph of another person, and then message "please don't send my son to prison" to a 20-year-old female juror in West's trial. Kemp explained that West and the juror had been "silent talking."

---

[3] The detective later testified for the jury that Kemp and West were in the same "pod," which he described as a "grouping of cells."

9

In a second phone call later that day, Kemp gave Hodges the name of the juror, and he spelled out the name based on information that was apparently being relayed to him from a nearby, unidentified third person.

Outside the presence of the jury, the trial court heard testimony from Hodges, who acknowledged that she was a party to the calls but denied creating a false Facebook account, and then the juror at issue. The juror denied that any person had contacted her on Facebook indicating that she was West's mother. Nor, the juror testified, had any person contacted her, on Facebook or otherwise, for the purpose of talking to her about her jury service in the case. The juror further testified that she had not noticed West silently mouthing any words to her, but that she had noticed West making direct eye contact. The trial court found the juror's testimony to be credible, but released her from service out of concern for her ability to remain fair and impartial. The trial court then questioned the other jurors, who each denied having been contacted improperly regarding his or her service as a juror, or having witnessed or been made aware of anyone attempting to contact another juror.

The recordings of the two phone calls were admitted into evidence over

objection.[4] The detective testified before the jury as to his investigation into the calls, including his identification of Kemp and Hodges, and to his recollection as to the contents of the calls, and the recordings were then played for the jury.

West argues that the phone calls were evidence of extrinsic acts, specifically, attempt to commit the crime of embracery and conspiracy to commit the crime of embracery.[5] He contends that this evidence improperly placed his character into evidence, was irrelevant to the issues being tried, and that its probative value, if any, was substantially outweighed by its prejudicial effect. It follows, he argues, that the trial court abused its discretion and committed reversible error in admitting the evidence.

OCGA § 24-4-404 (b) ("Rule 404 (b)") provides in pertinent part that "[e]vidence of other crimes, wrongs, or acts shall not be admissible to prove the character of a person in order to show action in conformity therewith[,]" but that

[4] Before their admission, the trial court found that the phone conversations' "probative value clearly outweighs the prejudicial impact." The trial court clarified in its order on motion for new trial that, during the trial, "[t]he Court considered the matter carefully, deciding that the calls were relevant evidence, and that the probative value of the evidence was not substantially outweighed by its prejudicial impact on the defendant."

[5] As pertinent here, "[a] person commits the offense of embracery when he[,] . . . with intent to influence a person summoned or serving as a juror, communicates with him otherwise than is authorized by law in an attempt to influence his action as a juror[.]" OCGA § 16-10-91 (a) (1).

11

such evidence may "be admissible for other purposes, including, but not limited to, proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." OCGA § 24-4-403 ("Rule 403") provides:

> Relevant evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.

Under the statutory framework of Rule 404 (b) and Rule 403,

> extrinsic act evidence may be admitted if a three-part test is met: (1) the evidence is relevant to an issue in the case other than the defendant's character, (2) the probative value is not substantially outweighed by the danger of unfair prejudice as required by Rule 403, and (3) there is sufficient proof for a jury to find by a preponderance of the evidence that the defendant committed the prior act.

*Jones v. State*, 301 Ga. 544, 545 (802 SE2d 234) (2017) (citation and footnotes omitted). "[W]hen an appellate court reviews the admission of Rule 404 (b) evidence and the proper application of the Rule 403 balancing test, the trial court's decision will not be disturbed unless there is a clear abuse of discretion." Id. at 548 (2). The evidence of the conspiracy to improperly influence a juror in West's trial was admitted over objection that it was improper character evidence, and, similar to some cases in which a defendant attempted to intimidate or

influence a witness, involved a wrongful act extrinsic to the crimes for which he was on trial.[6] Accordingly, we consider whether its admission was permissible under Rule 404 (b).

The jury could conclude by a preponderance of the evidence that West, Kemp's podmate, who Kemp stated was next to him during the phone call in

---

[6] Federal appellate courts have reviewed evidence of a defendant's attempt to threaten or influence a witness separate and more distant in time from the underlying crime to assess whether it constituted improper character evidence for purposes of Federal Rule of Evidence 404 (b) ("Federal Rule 404 (b)"). See *United States v. Brazel*, 102 F3d 1120, 1153-1154 (II) (I) (2) (11th Cir. 1997) (assessing under Federal Rule 404 (b) claim of plain error in admitting evidence of appellant's attempt to threaten witness); *United States v. Gonzalez*, 703 F2d 1222, 1223-1224 (11th Cir. 1983) (evidence that defendant had threatened a government informant "was relevant under [Federal Rule] 404 (b)," and the trial court did not abuse its discretion in its balancing of the probative value of that evidence against its potential prejudice). See also *United States v. De La Cruz-Feliciano*, 786 F3d 78, 89-90 (II) (B) (2) (1st Cir. 2015) ("[E]vidence that [Appellant] threatened a government witness is probative of his 'consciousness of guilt.' . . . This use of prior acts evidence is entirely permissible under [Federal] Rule 404 (b).") (citations and punctuation omitted); *United States v. Mickens*, 926 F2d 1323, 1328-1329 (III) (A) (2d Cir. 1991) ("[S]tandards for admission of [Federal] Rule 404 (b) evidence were satisfied" in the admission of evidence of threat to witness.); *United States v. Hayden*, 85 F3d 153, 159 (4th Cir. 1996) (evidence of witness intimidation is admissible under Federal Rule 404 (b) to prove consciousness of guilt and criminal intent). Compare *United States v. Zierke*, 618 F3d 755, 759 (II) (A) (8th Cir. 2010) (intimation of desire by defendant that his son harm witness was direct evidence of crime charged, as it showed defendant's consciousness of guilt, and was not Federal Rule 404 (b) evidence). We note that where an attempt to influence a witness is "(1) an uncharged offense arising from the same transaction or series of transactions as the charged offense; (2) necessary to complete the story of the crime; or (3) inextricably intertwined with the evidence regarding the charged offense," it would be properly treated as intrinsic evidence and thus not subject to the "limitations and prohibition on 'other acts' evidence set out in [Rule 404 (b)]." *Williams v. State*, 302 Ga. 474, 485 (IV) (807 SE2d 350) (2017) (citation and punctuation omitted) (explaining "intrinsic" evidence).

which Kemp asked Hodges to influence a juror in West's trial, was part of a conspiracy to influence the juror. The evidence was relevant as it tended to show West's consciousness of guilt. See *United States v. Padilla*, 203 F3d 156, 162 (III) (2d Cir. 1999) ("[E]vidence of the conspiracy [to obstruct justice by witness and jury tampering] was highly probative of the appellants' consciousness of guilt[.]"). Similarly, "[e]vidence of a defendant's attempt to influence or intimidate a witness can serve as circumstantial evidence of guilt." *Anglin v. State*, 302 Ga. 333, 341 (6) (806 SE2d 573) (2017) (citation and punctuation omitted).[7] The first and third prongs of the three-part test were met.

This leaves the Rule 403 balancing test. "Rule 404 (b) is a rule of inclusion and Rule 403 is an extraordinary exception to that inclusivity." *State v. Atkins*, 304 Ga. 413, 423 (2) (c) (819 SE2d 28) (2018) (citation omitted). The evidence of West's consciousness of guilt was of more than marginal value to the State, which sought to establish beyond a reasonable doubt that West was a party to the crime of malice murder and other offenses,[8] and not merely present at the scene. See *Olds v. State*, 299 Ga. 65, 75-76 (2) (786 SE2d 633) (2016) (probative value

[7] See footnote 6, supra.

[8] See OCGA § 16-2-20 (b) (3), (4).

rests, among other things, on the marginal worth of the evidence and on the need for that evidence). As to the danger of unfair prejudice, the evidence was pertinent to West's consciousness of guilt *in this case*, and the potential for prejudice, to that extent, arises from its probative value. See *United States v. Monahan*, 633 F2d 984, 985 (1st Cir. 1980) ("Because the evidence [of appellant's threats to witnesses] implicated no irrelevant or collateral matters, any 'prejudice' that arose did so only because of the evidence's probative character.").

West suggests that he was unfairly prejudiced in that his guilt or innocence was to be determined by jurors already seated in the case, while the extrinsic act showed a plan to contact and influence "one of their own." However, the evidence did not suggest that any of the other jurors were actual or potential targets of the conspiracy, nor was the nature of the scheme, which was based on subterfuge and an apparent assessment by West that he had established a link, through "silent talking," with one juror, of a nature likely to inflame the remaining jurors. Compare *United States v. Gonzalez*, 703 F2d 1222, 1223-1224 (11th Cir. 1983) (because the prejudice from evidence that defendant threatened the life of a witness may be great, the government must have an important

15

purpose in introducing such evidence to satisfy the balancing test of Federal Rule 403). We cannot say, as a matter of law, that the probative value of the evidence was substantially outweighed by the danger of unfair prejudice. Rather, we find no abuse of discretion in its admission and therefore affirm.

Judgment affirmed.  All the Justices concur.

Decided March 11, 2019.

Murder. Gwinnett Superior Court. Before Judge Tom Davis.

G. Richard Stepp, for appellant.

Daniel J. Porter, District Attorney, Lee F. Tittsworth, Michael D. Morrison, Assistant District Attorneys; Christopher M. Carr, Attorney General, Patricia B. Attaway Burton, Deputy Attorney General, Paula K. Smith, Senior Assistant Attorney General, Matthew M. Youn, Assistant Attorney General, for appellee.