313 Ga. 247
FINAL COPY

S21A1273. MORRELL v. THE STATE.

PETERSON, Justice.

Karonta Morrell was charged with 21 counts in connection with the murders of Rocquan Scarver and Jonathan Lang. Prior to trial, the trial court granted Morrell's motion to sever the counts related to Scarver's murder from the counts that were related to Lang's. Following a jury trial, Morrell was found guilty on all charges related to Scarver's murder.[1] On appeal, Morrell argues that the

---

[1] The crimes against Scarver occurred in December 2015, and the crimes connected to Lang's murder occurred in March 2016. A Chatham County grand jury returned a 21-count indictment relating to both murders against Morrell in March 2016. For Scarver's murder, Morrell was charged with malice murder (Count 1), two counts of felony murder (Counts 2-3), one count of aggravated assault (Count 4), three counts of possession of a firearm during the commission of a felony (Counts 5-7), and one count of possession of a firearm by a convicted felon (Count 8). At a trial in July 2019 on Counts 1-8, the jury found Morrell guilty on all counts. The trial court sentenced Morrell to life in prison without the possibility of parole on Count 1 and two five-year terms — consecutive to Count 1 and concurrent with each other — for Counts 5 and 8; the remaining counts were merged or vacated by operation of law. Morrell filed a timely motion for new trial, which he later amended. The trial court denied Morrell's motion for new trial, and he timely appealed. Morrell was found guilty on Counts 9-21, the counts related to Lang's murder, during a separate trial held in 2018 and sentenced to life in prison without the possibility of

trial court erred in admitting hearsay evidence under the forfeiture-by-wrongdoing provision of OCGA § 24-8-804 (b) (5) ("Rule 804 (b) (5)"), admitting other-acts evidence of witness intimidation connected to Lang's murder under OCGA § 24-4-404 (b) ("Rule 404 (b)"), and denying his motion to remove a juror whom Morrell claims was not impartial. We affirm because the trial court did not abuse its discretion in admitting the hearsay evidence; it did not abuse its discretion in admitting the other-acts evidence of witness intimidation; allowing the references to Lang's murder was error but harmless; and the trial court did not abuse its discretion in denying Morrell's motion to excuse the challenged juror.

Morrell was a member of the Crips gang. On December 10, 2015, Scarver, who was associated with the rival Bloods gang, was

parole plus 70 years on Counts 9, 12, 15, 16, 18, 20, and 21, with the remaining counts being vacated by operation of law or merged. Those convictions are not at issue in this appeal; Morrell filed a timely motion for new trial in that case, but that motion was still pending at the time he filed an appeal in this case, which was docketed to this Court's August 2021 term and submitted for a decision on the briefs. See *Seals v. State*, 311 Ga. 739, 744 (2) (b) (860 SE2d 419) (2021) ("[W]hen a count is severed from a multi-count indictment, and separate trials are held on the severed counts, each conviction on the severed counts is separately appealable when the sentence is entered on the severed count.").

killed in an apparent gang-related shooting. Police interviewed witnesses in response to the shooting. Martita Harris and David Jackson, eyewitnesses and cousins of Morrell, identified Morrell as the shooter. Harris said that, after shooting Scarver, Morrell fled the scene in a grey vehicle with a black bumper that Harris identified as belonging to Valencia Allen. Morrell fled with "Beefy," whom Harris identified as Allen's boyfriend. Morrell was not apprehended until several months later, when he was arrested for killing Lang.

About two weeks prior to Morrell's July 2019 trial, the State moved under the forfeiture-by-wrongdoing provisions of Rule 804 (b) (5) to admit into evidence Jackson's recorded out-of-court statements to police. The State argued that Morrell had intimidated witnesses in the Lang murder case and had also caused Jackson to be unavailable in this case.

The trial court took up the State's motion on the first day of trial. The State proffered that Jackson, who was not present, had been served with a subpoena and that Morrell was responsible for Jackson's absence. The State played recordings of phone calls in

3

which Morrell talked about paying someone off, needing a "b\*tch" to disappear, and having destroyed evidence. The State proffered that Morrell was referring to an eyewitness to the killing of Lang and that the police had moved that witness for her safety after hearing Morrell's recorded call.

The State argued that Morrell was attempting to intimidate witnesses in this case as well, proffering that after he was provided with unredacted discovery, his cousin, Celeste Gaines, posted on her Facebook page the names and identifying information of several witnesses in this case, including Jackson and Harris. According to the State, the witnesses started receiving threats after Gaines's Facebook post, and Gaines pleaded guilty to ten counts of intimidating witnesses in this case, including Jackson and Harris.

Morrell argued in response that Jackson had cooperated with the State before, the State had not shown due diligence in attempting to secure his attendance, and there was no evidence that his absence was due to any of Morrell's actions. Morrell asked the trial court to deny the State's motion but issue a material-witness

4

warrant for Jackson. After hearing the parties' arguments, the trial court ruled that Jackson's recorded out-of-court statements fell within Rule 804 (b) (5) and were therefore admissible, and it also signed a material witness warrant for Jackson in an attempt to secure his testimony.

At trial, Harris testified that Morrell and Beefy were standing on a street corner when Scarver threw up a gang sign that angered Morrell. Morrell then snuck up behind Scarver, shot him in the back of the head, and fled with Beefy in Beefy's car. Harris admitted on cross-examination that her testimony was different from her statement to police, in which she said that Morrell shot Scarver in the face. Allen testified that her boyfriend, Charles Steplight, was known as "Beefy" and that she owned a silver car with a black front bumper. Allen confirmed that, at the time Scarver was killed, she owned the vehicle that Harris had previously identified as the getaway car. Allen said that she was living with Steplight at the time of Scarver's death, they lived a few blocks away from the murder scene, and Steplight had access to her car keys. Allen

confirmed that Steplight and Morrell were friends.

During a break in the trial, the State informed the trial court that investigators could not locate Jackson, but that after Jackson learned of the material-witness warrant, he had called the prosecutor's office and stated that he would not appear in court. The State played a recording of that phone call for the court, and that recording was later admitted into evidence and played for the jury. In that call, Jackson was reminded of the court order for his appearance at trial, but said that he could not "go against [his] family" by testifying against Morrell and repeatedly said that he did not want to testify because he would "be putting his life at risk" if he did. An employee of the prosecutor's office tried to convince Jackson to "come in" to see what could be done to keep him safe, but Jackson responded that "y'all cannot save me" and "you cannot help me." Jackson further explained:

> [Y]ou're not gon' be with me when I sleep. You're not gon' be with me when I [have to] go places. You're not gon' be there. So how y'all can help? There's no safety. There's no savin' me, there's nothin' to save . . . .

Jackson also said that he was going to "say nothin'" even if he went to court and did not even want to "show my face in a courtroom."

Through Detective Eric Blaser, the lead detective who interviewed Jackson, the State introduced Jackson's recorded statements to the police made prior to his recorded phone call to the district attorney's office. Those recorded statements revealed the following. On the night of the shooting, Jackson told police that he heard the gunshot and saw Scarver fall to the ground, but did not see who shot him. In an interview several days later, Detective Blaser confronted Jackson with information that Jackson had told someone else that he saw the shooter, and Jackson expressed concern about whether his name would be on any police report, stating that he wanted to remain anonymous and did not want things to "hit the fan." Jackson revealed that he was reluctant to identify the shooter and would not want to testify because the shooter was his cousin; when asked for his cousin's name, Jackson said "Karonta," and he identified Morrell in a photo lineup. Detective Blaser testified that Jackson was reluctant to testify

because he was afraid.

Detective Blaser also testified that Gaines pleaded guilty to ten counts of witness intimidation for Facebook postings in which she said she was about "to upload these snitches' names that's in somebody paperwork," listed Harris's and Jackson's names, and posted a screen shot of a police report that was available only to the parties (including Morrell) and not the public. Detective Blaser testified that there was no evidence that the government provided the information to Gaines. The record shows that Gaines posted the material to her Facebook page on June 7, 2016.

The State also presented evidence under Rule 404 (b) for the purpose of showing Morrell's pattern of witness intimidation that was carried out in this case through Gaines's conduct and that, as a result, demonstrated his consciousness of guilt. The State called the detective who investigated the Lang murder, who testified that a witness had identified Morrell as the person who killed Lang. The detective said he was familiar with witness intimidation in both cases, referred to recorded phone calls that had been admitted, and

8

testified that Morrell had talked about having destroyed evidence in that case. In one call recorded shortly after he was arrested in March 2016, an unidentified woman asked Morrell if he needed her to do something. Morrell referred to a "b*tch" and said she needed to "change her motherf*ckin' . . ." before explaining that she needed to "disappear." The unidentified woman told Morrell, "You don't worry about that, I got you," and, "You don't need to do too much talkin' over the phone." The detective testified that an eyewitness in the Lang case was relocated for her safety after police learned of Morrell's statement about "making someone disappear" and Morrell's plan to start communicating in ways that could not be monitored. In the final charge to the jury, the trial court instructed the jury that it was to consider this other-acts evidence only as it related to Morrell's plan to intimidate witnesses and not for any other purpose, including whether the evidence showed that Morrell had a propensity to commit certain crimes.

1. Morrell argues that the trial court erred in admitting Jackson's recorded interviews under Rule 804 (b) (5), because the

9

State did not show what efforts were made to locate and produce Jackson prior to trial, failed to request a material-witness warrant prior to trial, and failed to establish that Jackson's unavailability was due to any wrongdoing by Morrell. Morrell also argues that the admission of the hearsay statements violated his constitutional right to confrontation. We disagree.

Hearsay statements are generally not admissible, but Rule 804 provides some exceptions to that rule. As relevant here, Rule 804 (b) (5) allows a hearsay statement to be admitted against "a party that has engaged or acquiesced in wrongdoing that was intended to, and did, procure the unavailability of the declarant as a witness." OCGA § 24-8-804 (b) (5). To admit such a statement against a defendant, the State must prove by a preponderance of the evidence that: (1) the defendant engaged in or acquiesced in wrongdoing; (2) the wrongdoing "was intended to procure the declarant's unavailability"; and (3) the wrongdoing "did procure the unavailability." *Hendrix v. State*, 303 Ga. 525, 528 (2) (813 SE2d 339) (2018) (citation and punctuation omitted). For a witness to be

considered unavailable under Rule 804, the party moving to admit the witness's statement must show that "reasonable, good-faith efforts" were made to procure the witness's attendance. *Welch v. State*, 309 Ga. 875, 878-879 (2) (848 SE2d 846) (2020). For evidentiary rulings, we accept a trial court's factual findings unless clearly erroneous and review a trial court's ultimate decision on the issue for an abuse of discretion. See *State v. Wilkins*, 302 Ga. 156, 160 (805 SE2d 868) (2017). The clearly erroneous standard is equivalent to the highly deferential "any evidence" standard, which means we will not reverse a trial court's factual findings if there is any evidence in the record to support them. See, e.g., *Jordan v. State*, 305 Ga. 12, 17 (3) (823 SE2d 336) (2019); *Reed v. State*, 291 Ga. 10, 13 (3) (727 SE2d 112) (2012).

The State carried its burden of proof in establishing that Jackson's unavailability was caused by Morrell's wrongdoing. Regardless of whether the State produced sufficient evidence of its good-faith efforts to secure Jackson's testimony at the time the trial court ruled on the State's Rule 804 (b) (5) motion, the State did

11

produce such evidence by the time Jackson's statements were actually introduced at trial. In particular, prior to introducing Jackson's statements through Detective Blaser, the State stated that one of its investigators had attempted to serve the material-witness warrant on Jackson and could not locate him. The State also submitted evidence that, after learning of the warrant, Jackson called the prosecutor's office and repeatedly said he would not appear in court and would not testify if he was brought to court, even after being told that there was a court order for him to do so. This evidence was sufficient for the trial court to determine that Jackson was an unavailable witness. See *United States v. Siddiqui*, 235 F3d 1318, 1325 (11th Cir. 2000) (government made sufficient showing of unavailability where witness said she did not want to attend trial and did not change her mind despite government's urging);[2] *Lopez v. State*, 355 Ga. App. 319, 321 (1) (844 SE2d 195) (2020) (State

---

[2] As we have previously noted, because Rule 804 (b) (5) mirrors its counterpart in the Federal Rules of Evidence, Federal Rule of Evidence 804 (b) (6), we look to decisions of the federal appellate courts construing and applying the federal rule in determining the meaning of our own rule. See *Hendrix*, 303 Ga. at 527 (2) n.3.

12

provided sufficient evidence that witness who failed to appear for trial was unavailable by presenting testimony that witness said she would rather be jailed than appear for trial when she was served with subpoena).

Nor did the trial court clearly err when it found that Morrell engaged in or acquiesced in wrongdoing intended to procure Jackson's unavailability.[3] The State established that Morrell tried to silence and intimidate witnesses in the Lang case, supporting an inference that he also was involved with the intimidation against Jackson in this case. The State played for the trial court recordings from the Lang case in which Morrell talked about paying someone off and making a "b*tch" disappear, and the State presented evidence that the person in question was an eyewitness who had to be relocated for her safety after the police learned of Morrell's statements.

---

[3] In admitting Jackson's statements into evidence at trial, the trial court stated only that the record showed that the statements met the hearsay exception, but in the order denying Morrell's motion for new trial, the trial court specifically found that Morrell "engaged in or acquiesced in wrongdoing that was intended to, and did, procure" Jackson's unavailability.

More particular to this case, the State showed that one of Morrell's cousins, Gaines, posted to her Facebook page threats against witnesses in this case, whom she described as "snitches," and listed identifying information for those witnesses, including Jackson and Harris. Although the State did not show with direct evidence that Morrell asked Gaines to post this information, there was sufficient evidence for the trial court to conclude that he did. The information used by Gaines to intimidate witnesses was not publicly available, Morrell was one of the few people who had access to it, and there was no evidence the State provided this information to Gaines. The direct evidence of Morrell's wanting to get rid of a witness in the Lang case further supported the trial court's finding that Morrell participated in or acquiesced in a plan to prevent witnesses in this case, including Jackson, from testifying against him. See, e.g., *United States v. Johnson*, 495 F3d 951, 971 (8th Cir. 2007) ("The fact that [the defendant] may have only aided and abetted the procurement of the witnesses' unavailability is of little moment."); *United States v. Stewart*, 485 F3d 666, 671 (2d Cir. 2007)

14

(rejecting defendant's claim that the government was required to show with direct evidence that he was involved in murder of a witness because "[b]oth the existence of a conspiracy and a given defendant's participation in it with the requisite knowledge and criminal intent may be established through circumstantial evidence"); *United States v. Scott*, 284 F3d 758, 764 (7th Cir. 2002) (concluding that "[i]t would not serve the goal of Rule 804 (b) (6) to hold that circumstantial evidence cannot support a finding" that a defendant threatened or coerced a witness not to testify); *United States v. Cherry*, 217 F3d 811, 820 (10th Cir. 2000) (concluding a declarant's statements may be admitted against a person who participated in a conspiracy to silence the declarant even if that person did not himself engage in witness intimidation or other wrongdoing); see also *Lebis v. State*, 302 Ga. 750, 758 (II) (B) (808 SE2d 724) (2017) ("[W]hen the crimes involve relatives, slight circumstances can support the inference that the parties colluded." (citations and punctuation omitted)).

The trial court also did not clearly err in concluding that

15

Morrell's actions procured Jackson's unavailability. Morrell argues that Jackson only said he would not testify against his family. That was one reason given by Jackson, but it was not the only reason. When Jackson identified Morrell as the shooter, he expressed concern about his name appearing in any police reports, indicating that he would encounter trouble. When he called the district attorney's office months later, after Gaines's Facebook posts, he repeatedly expressed fear for his life if he testified and rebuffed the State's offer to try to keep him safe, insisting that the State could not protect him adequately. Given this evidence and the deference we afford the trial court's factual findings, the trial court did not abuse its discretion in admitting Jackson's statement under Rule 804 (b) (5). See *Hendrix*, 303 Ga. at 527-528 (2) (although witness initially gave information to police, witness was deemed unavailable when she refused to appear for trial, was brought in on arrest warrant, and was uncooperative on witness stand; her unavailability was caused by defendant's wrongdoing after defendant commanded witness not to cooperate and called her a

16

"snitch," at which time she told the State she was afraid she would be killed if she testified); *Lopez*, 355 Ga. App. at 321-322 (1) (no error in admitting witness's statements under Rule 804 (b) (5) where witness did not appear to testify at defendant's trial and evidence showed that defendant pressured witness not to comply with subpoena and told her the State would be unable to proceed with the case against him if she did not cooperate). Because we affirm the trial court's decision to admit Jackson's statements under Rule 804 (b) (5), there is no merit to Morrell's argument that the admission of those statements violated his constitutional right of confrontation. See *Hendrix*, 303 Ga. at 528 (2) ("One who obtains the absence of a witness by wrongdoing forfeits the constitutional right to confrontation." (quoting *Davis v. Washington*, 547 U.S. 813, 833 (IV) (126 SCt 2266, 165 LE2d 224) (2006) (punctuation omitted)).

2. Morrell next argues that the trial court erred in allowing the State to introduce under Rule 404 (b) other-acts evidence regarding the Lang case and the alleged acts of intimidation against witnesses in that case.

Before trial, the State gave notice pursuant to Rule 404 (b) that it intended to introduce evidence related to Lang's death for the purpose of showing Morrell's intent, preparation, plan, and witness intimidation. At a pretrial hearing on the Rule 404 (b) motion, the State's primary argument was that the other-acts evidence related to the Lang case was relevant to show that Morrell had intimidated witnesses in this case and thus had displayed consciousness of guilt. Specifically, the State argued that because Gaines would not directly name Morrell as the person providing the material she used on her Facebook post to intimidate witnesses in this case, the State needed to introduce evidence of Morrell's witness intimidation in the Lang case in order to show that he was engaging in "wholesale witness tampering" when all of the charges were indicted together.[4]

---

[4] Morrell also briefly suggests that the trial court erred in admitting evidence of Gaines's intimidation of witnesses. But his enumeration of error references only evidence related to the Lang case. The evidence of Gaines's intimidation concerned intimidation of witnesses in this case, including Jackson and Harris, not witnesses in the Lang case. The State's Rule 404 (b) notice and its argument on the issue related exclusively to witnesses in the Lang case, not Gaines's conduct. Morrell cannot expand his enumeration of error by arguing about the incorrectness of a trial court ruling not encompassed by the enumeration. See *Wallace v. State*, 303 Ga. 34, 37-38 (2) (810 SE2d 93) (2018).

Following the hearing, the trial court ruled that the other-acts evidence was admissible on the basis that it was relevant to consciousness of guilt and because its probative value was not substantially outweighed by the danger of unfair prejudice as the State was seeking to introduce evidence only that Morrell intimidated witnesses, not that he was involved in another murder.

Under Rule 404 (b), "[e]vidence of other crimes, wrongs, or acts shall not be admissible to prove the character of a person in order to show action in conformity therewith[,]" but such evidence may be admissible for other purposes, including to prove intent, preparation, and plan. See OCGA § 24-4-404 (b) (containing non-exhaustive list of permissible purposes); *State v. Jones*, 297 Ga. 156, 159 (2) (773 SE2d 170) (2015) (Rule 404 (b) "is, on its face, an evidentiary rule of inclusion which contains a non-exhaustive list of purposes other than bad character for which other acts evidence is deemed relevant and may be properly offered into evidence").[5] To

---

[5] Although the State initially offered the disputed evidence to show intent, preparation, and plan, the trial court instructed the jury that it could

offer evidence under Rule 404 (b), a party must show that

> (1) the evidence is relevant to an issue in the case other than the defendant's character; (2) the probative value of the evidence is not substantially outweighed by its undue prejudice; and (3) there is sufficient proof for a jury to find by a preponderance of the evidence that the defendant committed the other act.

*Kirby v. State*, 304 Ga. 472, 479 (4) (819 SE2d 468) (2018). We review the trial court's admission of other-acts evidence for abuse of discretion. See id.

Morrell argues that the trial court abused its discretion in admitting the contested evidence because, although evidence of witness intimidation is relevant to show consciousness of guilt, any consciousness of guilt is case-specific, and such consciousness of guilt in the Lang case would not extend to this case. He also argues that the evidence about Lang's murder was unfairly prejudicial. Morrell does not argue that the State failed to meet its burden on the third prong of the Rule 404 (b) test,[6] so we address only the first

---

consider the evidence only as it related to Morrell's plan to intimidate witnesses and for no other purpose.

[6] Morrell argues that the State did not present sufficient evidence with

20

and second parts. Conducting that review, we conclude that the evidence of witness intimidation in the Lang case was properly admitted, the references to Morrell killing Lang were not, and the error in allowing the references to Lang's killing was harmless.

(a) *The Rule 404 (b) evidence regarding witness intimidation was relevant to an issue other than Morrell's character.*

A disputed issue in the case was whether Morrell intimidated Jackson from testifying. There was no evidence that he threatened Jackson directly or attempted to do so, but there was evidence showing that Gaines did. For the evidence of Gaines's conduct to be admissible against Morrell, the State had to present evidence showing that Morrell was involved in Gaines's threats. The State argued that it did so because the other-acts evidence showed Morrell's common plan to intimidate witnesses with respect to both sets of charges against him, both of which were proceeding at the same time. We agree with the State.

respect to his role in Gaines's intimidation of witnesses, but we rejected that argument in Division 1 above and, as discussed above, Gaines's conduct was not the subject of the other-acts evidence noted in the Rule 404 (b) motion and is not properly raised in this enumeration of error.

21

"Relevant evidence" is defined broadly as evidence "having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." OCGA § 24-4-401. "Questions of relevance are within the sound discretion of the trial court," and we will not disturb a trial court's determination of such a question absent a clear abuse of discretion. *Derrico v. State*, 306 Ga. 634, 636 (3) (831 SE2d 794) (2019).

Georgia law has long recognized that evidence that a defendant attempted to obstruct justice, including by intimidating a witness, is relevant because it can serve as circumstantial evidence of guilt. See, e.g., *Wade v. State*, 304 Ga. 5, 12 (5) (815 SE2d 875) (2018); *Ross v. State,* 255 Ga. 1, 3 (2) (b) (334 SE2d 300) (1985).

> Even where the defendant does not personally make the attempt to influence or intimidate a witness, it is a settled principle of law that an attempt by a third person to influence a witness not to testify or to testify falsely is relevant and may be introduced into evidence in a criminal prosecution on the issue of the defendant's guilt where it is established that the attempt was made with the authorization of the accused.

22

*Kell v. State*, 280 Ga. 669, 671 (2) (a) (631 SE2d 679) (2006) (citation and punctuation omitted). But "evidence of a threat or attempt to influence a witness made by a third party must be linked to the defendant in order to be relevant to any material issues." *Wade*, 304 Ga. at 12 (5) (citation and punctuation omitted).

In *West v. State*, 305 Ga. 467 (826 SE2d 64) (2019), we considered whether a third party's attempt to influence a juror in West's trial was admissible against West under Rule 404 (b). We concluded that the evidence was relevant to show the defendant's consciousness of guilt, because a jury could conclude that the defendant was part of a conspiracy to influence the juror where the third party indicated that the defendant was next to him during a phone call in which the third party discussed plans to influence the juror. See id. at 471-474 (2).

Our case law thus establishes that evidence of third-party conduct can be relevant to help establish a defendant's consciousness of guilt. Accordingly, Gaines's conduct of witness intimidation would be admissible against Morrell if the State could

23

link him to that conduct, as Gaines's acts of witness intimidation would show Morrell's consciousness of guilt. The question in this case is whether the State could establish Morrell's connection to Gaines's witness intimidation by presenting Morrell's other acts to establish his concurrent plan of witness intimidation in ongoing criminal cases against him. Rule 404 (b) does not define "plan" or otherwise set limits on its scope. Citing federal case law, we have recognized two general categories of "plan" evidence under Rule 404 (b): the other-acts evidence "shows the planning of or preparation for the charged offense," or it "tend[s] to prove that the defendant employed a 'common scheme' to commit a series of similar crimes." *Heard v. State*, 309 Ga. 76, 87 (3) (e) (844 SE2d 791) (2020) (citations and punctuation omitted).[7]

But *Heard* did not define the outer limits of the universe of "plan" evidence, and one of the federal cases cited in *Heard* noted

---

[7] Because the evidence statutes of Georgia's Evidence Code pertinent to the Rule 404 (b) analysis materially track their counterparts of the Federal Rules of Evidence, we take guidance from the decisions of the federal appellate courts in construing and applying Rule 404 (b). See *Heard*, 309 Ga. at 85 (3) (b).

the difficulty in attempting to do so. In *United States v. O'Connor*, 580 F2d 38, 41-42 (2d Cir. 1978), the court considered only a "common scheme or plan," as opposed to plans that "may be fairly characterized as unique," and identified two subcategories. The first subcategory, *O'Connor* explained, "includes other crimes evidence demonstrating a connected or inseparable transaction"; "[t]he second subcategory of common plan involves similar act testimony constituting a continuing scheme or conspiracy." Id. at 41. The first grouping includes evidence "designed 'to complete the story of the crime on trial by proving its immediate context of happenings near in time and place,'" while the second "concern[s] similar acts evidence offered to show the existence of a definite project intended to facilitate completion of the crime in question." Id. at 41-42 (citation and punctuation omitted).[8] *O'Connor* recognized that these two groups might sometimes overlap, and that its explanation of "'common scheme or plan' neither defines the outer boundaries of

---

[8] Sometimes what could be characterized as "plan" evidence is actually intrinsic evidence of the charged crimes and, therefore, not subject to the limits of Rule 404 (b). See *West*, 305 Ga. at 473 (2) n.6.

25

this category of other crimes evidence nor provides rules of easy application." Id. at 42.

This case does not fall neatly into any of the categories identified in *Heard* or *O'Connor*, but we see no abuse of discretion in admitting the evidence under the unusual circumstances here. Morrell was facing charges for killing both Scarver and Lang. Morrell's attempts to obstruct justice by destroying evidence and intimidating witnesses in the Lang case and Gaines's June 2016 Facebook post intimidating Scarver witnesses all occurred within the same short time span of March to June 2016. See *United States v. Oppon*, 863 F2d 141, 147 (1st Cir. 1988) (other-acts evidence showing that defendant had answered citizenship question on prior job applications similar to that at issue in the case was relevant to prove identity and a common scheme or plan, and the fact that the acts occurred within one year of charged offense provided "temporal proximity" that "strongly favor[ed] admissibility"). Although Morrell was not charged with witness tampering, the issue of whether he was part of a "conspiracy" or "plan" with Gaines to do so was relevant

to establishing his consciousness of guilt, and the other-acts evidence occurring near in time helped establish the link necessary to tie Gaines's conduct to Morrell. See *Wade*, 304 Ga. at 12 (5) (third party's attempt to influence a witness in the defendant's case is admissible where there is evidence linking action to the defendant); see also *O'Connor*, 580 F2d at 41 (plan evidence showing a "connected or inseparable transaction" is "designed to complete the story of the crime on trial by proving its immediate context of happenings near in time and place" (citation and punctuation omitted)).

Under the facts of this case, our conclusion that the other-acts evidence was relevant for the purpose of establishing a "plan" does not draw on improper propensity inferences. Compare *United States v. LeCompte*, 99 F3d 274, 278 (8th Cir. 1996) (concluding that other acts committed against a different victim eight to ten years prior to the charged offense failed to provide necessary linkage to establish a "plan," and stating that this other-acts evidence "is relevant to 'plan' or 'preparation' only insofar as it tends to prove a propensity

27

to commit crimes, which Rule 404 (b) prohibits"). We have previously acknowledged that the line between a proper purpose under Rule 404 (b) and improper propensity evidence is not always clear. See *Jones*, 297 Ga. at 163 (3) ("[T]he often subtle distinctions between the permissible purposes of intent and knowledge and the impermissible purpose of proving character may sometimes be difficult to discern."); see also *Booth v. State*, 301 Ga. 678, 685 (3) n.6 (804 SE2d 104) (2017) ("What appears to one person as propensity may be intent to another; the margin between is not a bright line." (citation and punctuation omitted)).

Without some connection between the other-acts evidence and the proposition that the State sought to prove, the other-acts evidence could have had a tendency solely to prove Morrell's propensity to commit a bad act. See, e.g., *LeCompte*, 99 F3d at 278. But the close timing here supports a logical inference that does not depend on Morrell's bad character. Explained another way, it is improbable that, after his being charged with crimes against Lang and Scarver, Morrell would personally participate in intimidating

28

witnesses against him regarding crimes against Lang, and also that — at about the same time — witnesses regarding the crimes against Scarver were intimidated (through the use of nonpublic information available to Morrell) without his involvement or acquiescence. Morrell cites no case excluding other-acts evidence under these circumstances, and we conclude that the trial court did not abuse its discretion in determining that the other-acts evidence was relevant for a proper purpose and was not offered solely to prove Morrell's bad character or propensity to commit a crime. See *Thompson v. State*, 302 Ga. 533, 539 (III) (A) (807 SE2d 899) (2017) ("Despite its inclusive nature, Rule 404 (b) prohibits the admission of such evidence when it is offered *solely* for the impermissible purpose of showing a defendant's bad character or propensity to commit a crime." (citation and punctuation omitted; emphasis in original)).

(b) *There was no abuse of discretion in concluding that the probative value of the witness intimidation evidence was not substantially outweighed by unfair prejudice.*

The second part of the Rule 404 (b) analysis requires satisfaction of OCGA § 24-4-403 ("Rule 403"), which provides:

Relevant evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.

The Rule 403 analysis is committed to the trial court's discretion, and exclusion of relevant evidence under this test is "an extraordinary remedy which should be used only sparingly." *Jones v. State,* 301 Ga. 544, 546-547 (1) (802 SE2d 234) (2017) (citation and punctuation omitted). In reviewing issues under Rule 403, courts must "look at the evidence in a light most favorable to its admission, maximizing its probative value and minimizing its undue prejudicial impact." *United States v. Brown,* 441 F3d 1330, 1362 (11th Cir. 2006).

There is no single test for conducting this Rule 403 balancing for "plan" evidence, likely because all circumstances should be taken into account. See *Sprint/United Mgmt. Co. v. Mendelsohn*, 552 U.S. 379, 387 (128 SCt 1140, 170 LE2d 1) (2008) ("Applying Rule 403 to determine if evidence is prejudicial also requires a fact-intensive, context-specific inquiry."); *United States v. Gomez*, 763 F3d 845, 857

(7th Cir. 2014) ("Because each case is unique, Rule 403 balancing is a highly context-specific inquiry; there are few categorical rules."); see also *United States v. Lopez*, 649 F3d 1222, 1247-1248 (11th Cir. 2011) (a trial court "is uniquely situated to make nuanced judgments on questions that require the careful balancing of fact-specific concepts like probativeness and prejudice, and we are loath to disturb the sound exercise of its discretion in these areas." (citation and punctuation omitted)).

We have said that when other-acts evidence is used to prove intent, a court's Rule 403 balancing involves a "common sense assessment of all the circumstances surrounding the extrinsic offense, including prosecutorial need, overall similarity between the extrinsic act and the charged offense, as well as temporal remoteness." *Jones*, 301 Ga. at 547 (1) (citation and punctuation omitted). Likewise, temporal proximity and similarity between the offenses are factors that are frequently cited as heightening probative value when other-acts evidence is offered to prove a defendant's plan. See, e.g., *United States v. Moye*, 793 Fed. Appx. 19,

22 (2d Cir. 2019) (evidence admissible because of the similarity and temporal proximity between incidents); *United States v. Aguilar-Aranceta*, 58 F3d 796, 801 (1st Cir. 1995) ("Common sense dictates that the time span between the events bears directly on the probative weight of the prior conviction[.]"); *Oppon*, 863 F2d at 147 ("[T]emporal proximity strongly favor[s] admissibility[.]").

Considering the totality of the circumstances, and remembering that Rule 403 should be used to exclude evidence "sparingly," with the exception of the reference to Morrell killing Lang, we see no abuse of discretion in the trial court's conclusion that the probative value of the evidence was not substantially outweighed by the danger of unfair prejudice. There was no direct evidence that Morrell worked with Gaines to intimidate witnesses in this case. But the recorded phone calls from the Lang case, all of which happened within a few months of the Gaines Facebook posting, show Morrell's attempts to cover up his crimes by destroying evidence or getting rid of witnesses. In one recorded call from jail, Morrell was asked by a woman how she could help him,

and he talked about making a "b\*tch" disappear. From these incidents — close in time to the witness intimidation that occurred in this case using confidential information to which Morrell had access — it would be reasonable for a jury to conclude that Morrell either directly asked Gaines to intimidate witnesses in this case, or that he at least acquiesced in her efforts, which would then be evidence of his consciousness of guilt in this case. See *West*, 305 Ga. at 474 (2) (concluding that other-acts evidence of defendant's attempt to influence juror showed consciousness of guilt that was "of more than marginal value to the State" because it helped establish the defendant's guilt); see also *Jones*, 301 Ga. at 547 (1) ("Probative value also depends on the marginal worth of the evidence — how much it adds, in other words, to the other proof available to establish the fact for which it is offered." (citation and punctuation omitted)). Moreover, because there was no direct evidence and Morrell disputed that he had any role in intimidating Jackson, there was significant prosecutorial need for other-acts evidence to explain why Jackson would not testify, which was important to how the jury

might view the hearsay statements that were presented instead. See *Jones*, 301 Ga. at 547 (1) (noting that the probative value of evidence becomes greater when the fact for which it is offered is disputed).

Although the evidence that Morrell killed Lang was certainly unfairly prejudicial, as we discuss below, the remaining evidence regarding his intimidation of witnesses was not. See *Anglin v. State*, 302 Ga. 333, 337 (3) (806 SE2d 573) (2017) ("[I]n a criminal trial, inculpatory evidence is inherently prejudicial; it is only when *unfair* prejudice substantially outweighs probative value that the rule permits exclusion." (citation and punctuation omitted; emphasis in original)). As a result, we cannot say that the trial court abused its discretion in admitting the evidence of witness intimidation in the Lang case.

(c) *The admission of references to Morrell's killing Lang was erroneous but ultimately harmless.*

The State offers no argument that the evidence that Morrell killed Lang was relevant or probative to any issue, and there is no doubt that this evidence was unfairly prejudicial. That Morrell

34

killed another person was the reason that a trial judge severed the Lang counts from the counts in this case. Although the other-acts evidence of witness intimidation related to Lang's murder, it was unnecessary for the State to elicit testimony that Lang was killed in order to show that Morrell had intimidated witnesses in that case. The State could have elicited the relevant information without mentioning Lang's murder, and the trial court abused its discretion in allowing such mentions. Nevertheless, the trial court's error was harmless.

It is fundamental that harm as well as error must be shown for reversal.

> The test for determining nonconstitutional harmless error is whether it is highly probable that the error did not contribute to the verdict. In determining whether trial court error was harmless, we review the record de novo, and we weigh the evidence as we would expect reasonable jurors to have done so as opposed to viewing it all in the light most favorable to the jury's verdict.

*Henderson v. State*, 310 Ga. 708, 713 (3) (854 SE2d 523) (2021) (citations and punctuation omitted).

Any error in admitting the evidence about Morrell killing Lang

was harmless, because it was highly probable that it did not contribute to the verdict. First, the evidence against Morrell was substantial. Two of his cousins were eyewitnesses and identified him as the shooter. Though Morrell challenged these statements, the accounts of Harris and Jackson corroborated each other in material part — that Morrell shot and killed Scarver. Harris also testified that Morrell fled with Steplight in a grey car with a black bumper after Morrell shot Scarver, and Steplight's girlfriend testified that Steplight lived near the scene of the crime, had access to her silver car on the day of the murder, and was friends with Morrell. Moreover, the evidence shows that Morrell was involved in witness intimidation in this case through Gaines's Facebook postings, reflecting his consciousness of guilt.

Second, the testimony about Lang's death was primarily relayed by the detective who investigated that case and stated that two witnesses had identified Morrell as Lang's killer. That detective did not testify about the details of Lang's death, such as whether he was shot or stabbed. Similarly, Detective Blaser made a passing

reference to the murder of Lang without discussing details about that case. The trial court prohibited the State from introducing evidence that Morrell was convicted of murdering Lang, and no evidence of this nature was introduced.

And although the State mentioned the Lang murder in closing arguments, it focused on Morrell's attempts to cover up his crimes, how this hindered the State from presenting additional evidence of guilt, and how it demonstrated his consciousness of guilt as a result. Thus, the references to Lang's killing were prejudicial but not extremely so, especially when the trial court instructed the jury that it was to consider the evidence from the Lang case solely for the purpose of determining whether Morrell had a plan to intimidate witnesses, that it was not to consider the other acts for any other purpose, and that Morrell was not on trial for those other acts. See *McWilliams v. State*, 304 Ga. 502, 511 (3) (820 SE2d 33) (2018) ("Any prejudicial impact of the extrinsic acts evidence was mitigated when the trial court gave the jury specific instructions about the limited purpose of the evidence.").

We acknowledge that whether the error in allowing the references to Lang's killing was harmless is a close question, but given the limited discussion of that crime, the substantial evidence of guilt, and the trial court's limiting instruction, we conclude that it was harmless. See *Howell v. State*, 307 Ga. 865, 875-876 (3) (838 SE2d 839) (2020) (holding that evidence of a prior crime was harmless, in part due to the strong evidence of guilt against the defendant and the limiting instruction directing the jury to consider the evidence for one purpose only and informing the jury that the defendant was not on trial for the prior crime). Cf. *Brooks v. State*, 298 Ga. 722, 723-724, 727-728 (2) (783 SE2d 895) (2016) (erroneous introduction of other-acts evidence that defendant had shot state trooper was extremely prejudicial where State presented details of the shooting and introduced evidence that defendant pleaded guilty to that offense).

3. Morrell argues that the trial court erred in denying his motion to excuse a juror who expressed doubts about her ability to be impartial. We disagree.

When the selected jury was being brought back into the courtroom for opening statements, Juror 34 remained in the jury room. The trial court questioned Juror 34 outside the presence of the rest of the jury, and she said, "I didn't really think I'd get this emotional." The prosecutor reminded the court that Juror 34 had disclosed during voir dire that her boyfriend's mother was killed and the defendant was found not guilty after a trial. Morrell's trial counsel noted that he "should have chimed in earlier" and that he thought he "might be able to strike her earlier on," and was now faced with the potential that Juror 34 would "infect the rest of the jury." Juror 34 said that she was not trying to get out of jury duty and confirmed that she did not know anything about Morrell's case. When asked if she could listen to the evidence impartially and decide the case based on the evidence, she responded, "I think so, I don't know." The trial court noted that Juror 34 had previously indicated that she could be fair and impartial, and Juror 34 replied, "I — I — I — I don't know how — I'm not sure if I can."

The trial court heard arguments about whether to excuse Juror

39

34. The prosecutor opposed releasing Juror 34, expressing concern about having enough jurors if another juror had to be excused, which would possibly result in a mistrial and would give Morrell another chance to "go after" witnesses. The court said it was inclined to keep Juror 34, prompting trial counsel to say, "Let her soldier through. But for the record, I would move to excuse her[.]" The trial court then formally denied Morrell's motion to excuse Juror 34.

OCGA § 15-12-172 vests the trial court with broad discretion to replace a juror with an alternate at any point during the proceedings where, among other reasons, it is shown that the juror is unable to perform his or her duty or legal cause exists. See *Ware v. State*, 305 Ga. 457, 461-462 (3) (826 SE2d 56) (2019). To excuse for cause a selected juror in a criminal case on the statutory ground that her ability to be fair and impartial is substantially impaired, a challenger must show that the juror "holds an opinion of the guilt or innocence of the defendant that is so fixed and definite that the juror will not be able to set it aside and decide the case on the evidence or the court's charge on the evidence." *Poole v. State*, 291 Ga. 848, 852

(3) (734 SE2d 1) (2012) (citation and punctuation omitted) (challenge to trial court's failure to remove selected juror). This test is the same as that for prospective jurors: a potential juror is not disqualified as a matter of law when he or she expresses doubt about his or her own impartiality or reservations about his or her ability to put aside personal experiences. See, e.g., *Collins v. State*, 308 Ga. 608, 612 (3) (842 SE2d 811) (2020); *Garrett v. State*, 280 Ga. 30, 31 (2) (622 SE2d 323) (2005).

Here, although Juror 34 expressed doubts about her ability to remain impartial, she did not express a fixed opinion about Morrell's guilt or innocence. Nor did she unequivocally indicate that she would be unable to decide the case based upon the evidence presented at trial and the trial court's instructions. Under these circumstances, the trial court did not abuse its discretion in refusing to remove Juror 34. See *Ellis v. State*, 292 Ga. 276, 283-284 (4) (b) (736 SE2d 412) (2013) (defendant failed to show that motion to strike three prospective jurors would have been successful where jurors made equivocal statements about their ability to decide the

case based on the evidence — "would try," "I hope I can," and "probably so" — but did not express a fixed opinion as to the defendant's guilt or innocence); *Corza v. State*, 273 Ga. 164, 166-167 (3) (539 SE2d 149) (2000) (juror's statement that she "would try" to set aside issue of gang membership after stating that the issue would affect her ability to remain impartial did not demand her removal because nothing in her responses indicated that she had formed a fixed and definite opinion of guilt or innocence).

*Judgment affirmed. All the Justices concur.*

Decided February 15, 2022.

Chatham Superior Court. Before Judge Cavender, Senior Judge.

*David T. Lock*, for appellant.

*Shalena Cook Jones, District Attorney, Bradley R. Thompson, Assistant District Attorney; Christopher M. Carr, Attorney General, Patricia B. Attaway Burton, Deputy Attorney General, Paula K. Smith, Senior Assistant Attorney General, Kathleen L. McCanless, Assistant Attorney General*, for appellee.