**NOTICE: This opinion is subject to modification resulting from motions for reconsideration under Supreme Court Rule 27, the Court's reconsideration, and editorial revisions by the Reporter of Decisions. The version of the opinion published in the Advance Sheets for the Georgia Reports, designated as the "Final Copy," will replace any prior version on the Court's website and docket. A bound volume of the Georgia Reports will contain the final and official text of the opinion.**



## SUPREME COURT OF GEORGIA
Case No. S23G1127

October 31, 2024

## ALFREDO CAPOTE v. THE STATE.

Upon consideration, the deadline for a motion for reconsideration in this case has been revised. It is ordered that a motion for reconsideration, if any, must be filed no later than **4:30 pm on Wednesday, November 6, 2024**.

**SUPREME COURT OF THE STATE OF GEORGIA**
Clerk's Office, Atlanta

I certify that the above is a true extract from the minutes of the Supreme Court of Georgia.

Witness my signature and the seal of said court hereto affixed the day and year last above written.

_____, Clerk



SUPREME COURT OF GEORGIA
Case No. S23G1127

October 31, 2024

The Honorable Supreme Court met pursuant to adjournment.

The following order was passed:

ALFREDO CAPOTE v. THE STATE.

After careful consideration of the full record and the briefs of the parties, the Court has determined that the writ of certiorari issued in Case No. S23G1127 was improvidently granted. Accordingly, the writ is vacated, and the petition for certiorari in Case No. S23C1127 is denied.

*All the Justices concur.*

**SUPREME COURT OF THE STATE OF GEORGIA**
Clerk's Office, Atlanta

I certify that the above is a true extract from the minutes of the Supreme Court of Georgia.
Witness my signature and the seal of said court hereto affixed the day and year last above written.

, Clerk

In the Supreme Court of Georgia

Decided: October 31, 2024

S23G1127. CAPOTE v. THE STATE.

WARREN, Justice, concurring.

Factually, this case is about whether the Court of Appeals correctly affirmed the trial court's denial of Alfredo Capote's motion to dismiss an indictment against him on the ground that its underlying factual findings were not "clearly erroneous." See *Capote v. State*, 368 Ga. App. 331 (890 SE2d 75) (2023). But our Court did not grant a writ of certiorari to review that fact-specific question; we granted certiorari to examine the correct standard of review appellate courts should apply when reviewing a trial court's factual findings in a criminal case. In doing so, we posed two questions: (1) whether this Court's precedent interpreting the clearly-erroneous standard of review of factual findings in criminal cases—which equates that standard with the any-evidence standard—is correctly

decided; and (2) if it is not correctly decided, whether this Court's precedent on the clearly-erroneous standard should be overruled. Those questions suggested an interest in examining the difference, if any, between the any-evidence standard and the clearly-erroneous standard—especially given that this Court has equated the two in both civil and criminal cases.

Having now received and reviewed the full record, and after review of the parties' briefs and oral arguments, the Court has determined that the writ of certiorari was improvidently granted, so it vacates the writ and denies Capote's petition for certiorari. Because I now see that this case is not a good vehicle for deciding the issues we set forth in granting certiorari, I concur in that decision. I write separately, however, to offer some historical perspective about the standards of review Georgia appellate courts have applied in reviewing trial court fact-findings in criminal cases, and to consider where we go from here.

*

For a discussion about standards of review to make sense, it is

helpful to understand the factual context in which the question about the standards arose. That's because a standard of review often feels like an academic rubric until it is applied to a particular set of factual or legal findings—and it is often only at that point that a difference in a standard of review bubbles to the surface. In light of that need for context, I review the relevant background of this case before reviewing the standards of review at issue here.

1. *Factual and Procedural Background.*

(a) The Court of Appeals summarized the pertinent facts of this case as follows.

> Alfredo Capote appeals from the trial court's order denying his motion to dismiss a pending indictment based on the State's alleged failure to comply with Article III (a) of the Interstate Agreement on Detainers Act ("IAD"), OCGA § 42-6-20. . . .
>
> "The IAD is an interstate compact intended, among other things, to provide procedures for the orderly disposition of outstanding charges against prisoners incarcerated in out-of-state facilities and detainers based upon such charges." *Clater v. State*, 266 Ga. 511, 512 (2), 467 S.E.2d 537 (1996). The IAD is codified in Georgia at OCGA § 42-6-20. At issue in this case is Article III of the IAD, which provides the procedure for an accused who is indicted in this State while incarcerated in another state to obtain a

5

"speedy trial" – to be tried within 180 days of the required notice – on the Georgia charges. Subsection (b) of Article III further provides:

> The written notice and request for final disposition referred to in paragraph (a) here shall be given or sent by the prisoner to the warden, commissioner of corrections or other official having custody of him, who shall promptly forward it together with the certificate to the appropriate prosecuting official and court by registered or certified mail or statutory overnight delivery, return receipt requested.

However, the 180-day time period "does not commence until the prisoner's request for final disposition of the charges against him has actually been delivered to the court and the prosecuting officer of the jurisdiction that lodged the detainer against him." *Fex v. Michigan*, 507 U. S. 43, 52, 113 S.Ct. 1085, 122 L.Ed.2d 406 (1993). See also OCGA § 42-6-20, Article III (a) (defendant shall be brought to trial within 180 days after "he shall have caused to be delivered to the prosecuting officer and the appropriate court of the prosecuting officer's jurisdiction written notice of . . . his request for a final disposition to be made of the indictment").

Pertinent here, the record shows that, following a conviction on federal wire fraud charges, Capote was incarcerated in the Federal Correctional Complex in Beaumont, Texas ("FCC"). Shortly before he was convicted on the federal charge, Capote was indicted in Gwinnett County, Georgia on numerous charges. In December 2020, a detainer was placed on Capote in accordance with the IAD.

6

On July 7, 2021, Capote requested that the FCC warden file on his behalf an IAD notice and request for disposition of the Gwinnett County charges. On that same day, the FCC warden sent a letter to Patsy Austin-Gatson, the Gwinnett County District Attorney, notifying her of Capote's IAD request for disposition and attaching certain forms required in connection with the request. A form attached to the letter had a preprinted notification that the letter had been sent to the prosecuting official and to the clerk of court by certified mail, return receipt requested. On that same day, the warden also sent Capote written verification that his IAD request had been sent.

No action was taken on the Gwinnett County charges and on January 28, 2022, Capote filed a motion to dismiss for failure to dispose of the charges within 180 days as required by Article III (a) of the IAD. The State opposed the motion, arguing, among other things, that neither the Gwinnett County District Attorney nor the Gwinnett County Clerk of Superior Court had ever received the IAD disposition request.

A hearing was held on the motion on April 22, 2022. At the hearing, in addition to submitting the letter from the warden addressed to the District Attorney, Capote also introduced copies of the return receipts for "Article addressed to: Gwinnett County District Clerk Attention Tiana P. Garner" and "Article addressed to: the Gwinnett Justice and Asministratic [sic] Attention: Patsy Austin-Gaston [sic]"; these return receipts were stamped received by "Gwinnett County Mail Services" on July 27, 2021.

The State presented the testimony of an Investigator with the Gwinnett County District Attorney's office concerning her efforts to locate Capote's IAD request. The

Investigator testified that she was familiar with the Gwinnett County District Attorney's procedures on how IAD disposition requests were handled and tracked, and she testified in detail regarding the steps she took in attempting to locate Capote's IAD request. She also testified about who in the office would have handled or received copies of an IAD request. She found no evidence documenting receipt of the IAD request, and she was unable to find anybody in the District Attorney's office with any knowledge of the IAD request. The investigator also said that she looked through the Gwinnett Superior Court's Odyssey filing system and was unable to find any documents related to Capote's IAD request in the court's files.[1]

---

[1] Based on my review of the record on appeal, I add the following details: Regarding her search of Gwinnett County Superior Court's Odyssey filing system, the investigator explained that "[t]he Odyssey system . . . where the [courts] keep their filings did not contain any documents related to [Capote's] IAD[.]" To conduct that search of the District Attorney's office, the investigator "followed the procedural steps and . . . identified where the IAD [disposition requests] should have gone through the office" once they were delivered by mail. She testified that once mail is received by a receptionist or other person in the District Attorney's office, that person "would have immediately given that document to the legal assistant assigned to the case number on the document. And that legal assistant would have then taken that document, documented it in tracker, which is our system[,]" before giving a "copy of it to the assigned prosecutor[.]" She then explained that "if those things were enacted[,] [the] tracker would have populated several things because of the roles each person played[,]" "[but] none of those things were found in [her] search." The investigator also admitted that she was not able to "find anybody who had even some knowledge" of Capote's IAD disposition request in the District Attorney's office. On cross-examination, however, the investigator admitted that the certified mail receipts Capote presented at the hearing for the mail sent to the District Attorney and the Clerk of Court bore the "RECEIVED" stamp of the Gwinnett County Mail Services, which she testified receives mail on behalf of the Clerk of Court and the District Attorney in the courthouse.

On June 8, 2022, the trial court entered an order denying Capote's motion to dismiss. Because there was no evidence that the return receipts introduced by Capote at the hearing corresponded to the documents supposedly sent by the FCC warden, the trial court determined that there was nothing to "affirmatively establish[ ]" that the letter sent by the FCC to the District Attorney's office complied with the Article III (b) requirement that the IAD notice be sent to the appropriate prosecuting official and court by registered or certified mail or statutory overnight delivery, return receipt requested. Further, crediting the testimony of the Investigator, the trial court also found that there was no evidence that the request was actually received by the Gwinnett County District Attorney's office or the Clerk of Court.

*Capote*, 368 Ga. App. at 331-333.

(b) *Court of Appeals's Analysis.* After granting Capote's request for interlocutory review, the Court of Appeals affirmed the trial court. See *Capote*, 368 Ga. App. at 333-334. In reviewing the trial court's findings of fact, the Court of Appeals explained that the exhibits Capote presented in support of his motion

> may have shown compliance with the mailing requirements of the IAD sufficient to create a rebuttable presumption that the letter was received by someone. But we disagree with Capote that the trial court was required to find that the letter was delivered to the prosecuting officer and the appropriate court. The return receipt showed only that it was delivered to Gwinnett County

9

> Mail Services, and the trial court specifically credited the testimony of [Investigator Tarver] in determining that the IAD request had not actually been delivered to the prosecuting officer or the court. This finding was *supported by at least some evidence*, and thus we cannot say that the trial court clearly erred.

Id. (emphasis added). In a specially concurring opinion, Presiding Judge Dillard "acknowledge[d] that both parties presented compelling evidence as to whether Capote's IAD request was delivered to both the Gwinnett County District Attorney's Office and the Gwinnett County Clerk of the Superior Court." Id. at 334 (Dillard, P.J., concurring specially). He emphasized, however, that the applicable standard of review for the trial court's factual findings was clear error; that "the clearly erroneous standard is, of course, equivalent to the highly deferential 'any evidence' standard"; and that because "there was *some* evidence supporting the trial court's conclusion that, for whatever reason, the district attorney's office and the superior court did not actually receive Capote's IAD request," the trial court was due to be affirmed. See id. at 334-335 (citing *Morrell v. State*, 313 Ga. 247, 251 (869 SE2d 447) (2022))

(emphasis in original) (cleaned up).

2. *This Case Does Not Present an Adequate Vehicle For Resolving The Questions Presented on Certiorari About the Standard of Review for Trial Court Fact-Findings in Criminal Cases.*

As the specially concurring opinion in the Court of Appeals highlighted, we have stated in our criminal precedents that an appellate court "accept[s] a trial court's factual findings unless clearly erroneous and review[s] a trial court's ultimate decision on the issue for an abuse of discretion." *Morrell*, 313 Ga. at 251. Somewhat confusingly, however, "[t]he clearly erroneous standard is equivalent to the highly deferential 'any evidence' standard, which means we will not reverse a trial court's factual findings if there is any evidence in the record to support them." Id.

In the present matter, the Court of Appeals applied the "any-evidence" standard to the trial court's factual findings and affirmed the denial of Capote's motion to dismiss. See *Capote*, 368 Ga. App. at 333-334. On certiorari, Capote contends that instead of applying the Georgia any-evidence standard (and the Georgia clearly-erroneous standard that follows), this Court should apply the *federal*

11

clearly-erroneous standard[2]—and that application of that different standard would require a reversal based on the very same facts. Capote points to that federal standard—that is, that a "finding is 'clearly erroneous' when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed," *United States v. U.S. Gypsum Co.*, 333 U.S. 364, 395 (68 SCt 525, 92 LEd 746) (1948)—and contends that the trial court's factual findings that "[t]here is no evidence that establishes that the return receipts presented by [Capote] were for the request sent by the" warden and that "there was no record of [Capote's Interstate Agreement on Detainers Act ("IAD") disposition] request[s] [were] received by either the DA's Office or the Clerk of Court" were clearly erroneous. Id.

But even applying that federal standard, I would not be able to muster a "definite and firm conviction that a mistake has been

---

[2] The main thrust of Capote's legal argument involves interpretation of the 1983 Georgia Constitution and its predecessors. I do not address those arguments here.

committed" here.  See id.  To that end, the record shows that Capote presented several exhibits at the hearing on his motion to dismiss—including an exhibit containing a written memorandum titled "RESPONSE TO INMATE REQUEST TO STAFF" from the warden of the Federal Correctional Complex in Beaumont, Texas, confirming that he "mailed via certified return [r]eceipt" Capote's IAD disposition requests to the "District Attorney, District Clerk and IAD Administrator of the State of Georgia,"  and a copy of the IAD disposition request addressed to the Gwinnett County District Attorney, with the "Clerk of Court" and "State IAD Administrator" carbon copied.   He also presented copies of return receipts for "Article Addressed to: Gwinnett County District Clerk[,]" "Attention Tiana P. Garner" and "Article Addressed to: the Gwinnett Justice and Asministratic[,]" [sic] "Attention: Patsy Austin-Gastson [sic]," that were stamped as received by "Gwinnett County Mail Services" on July 27, 2021.

But none of those exhibits affirmatively established the contents of the mail the warden of the Federal Correctional Complex

13

in Beaumont, Texas, sent on Capote's behalf. And they did not definitively establish that the Gwinnett County District Attorney, the Gwinnett County Clerk of Court, or Georgia's IAD administrator actually received Capote's IAD disposition request.[3]

Additionally, an investigator with the Gwinnett County District Attorney's office testified that "she was unable to find anybody in the District Attorney's office with any knowledge of the IAD request[,]" and "she looked through the Gwinnett Superior Court's Odyssey filing system and was unable to find any documents related to Capote's IAD request in the court's files." *Capote*, 368 Ga. App. at 333. And although the investigator admitted on cross-examination that the certified mail receipts Capote presented at the evidentiary hearing bore "RECEIVED" stamps from the Gwinnett

---

[3] In its order denying Capote's motion to dismiss, the trial court relied on this point—that is, the lack of evidence that the warden actually sent the disposition requests and the DA's Office or the Clerk of Court actually *received* the disposition requests. Compare OCGA § 42-6-20 Art. III (a), (b) (referencing the requirement for a imprisoned person seeking to avail himself of the IAD to "cause to be delivered" a notice that a warden or other qualifying official "shall promptly forward"). The interpretation of that aspect of the IAD presents a matter of federal statutory construction that neither the trial court nor the Court of Appeals considered, however, and I do not attempt to address it here.

County Mail Services—which she testified receives mail on behalf of the Clerk of Court and the District Attorney—the trial court credited the investigator's testimony about there being "no record of [Capote's IAD disposition] request being received by either the DA's Office or the Clerk of Court."

As a result, whatever questions I may have about the District Attorney's and the Clerk of Court's process for receiving, cataloging, and distributing mail (and, assuming its authenticity, how a "RECEIVED" stamp could have been affixed to the return receipts in this case without either the DA's Office or the Clerk of Court knowing), I would not be able to say that the exhibits Capote presented necessarily contradicted the investigator's story or that the investigator's story was "so internally inconsistent or implausible on its face that a reasonable factfinder would not credit it." *Anderson v. Bessemer City, N.C.*, 470 U.S. 564, 575 (105 SCt 1504, 84 LEd 518) (1985).

In sum: even applying the federal clearly-erroneous standard of review, I would not be able to say that the trial court's findings—

including its factual findings and its decision to credit the investigator's testimony as noted above—leave me "with the definite and firm conviction that a mistake has been committed." *U.S. Gypsum*, 333 U.S. at 395. And if that is so, the standard of review this Court applies to the trial court's findings—that is, whether this Court applies the federal clearly-erroneous standard, as opposed to Georgia's any-evidence standard—makes no practical difference to the resolution of Capote's appeal. For that reason, this case does not provide an adequate vehicle to answer the questions presented on certiorari, and I therefore concur in the dismissal of Capote's petition as improvidently granted.

3. *The History of Georgia's Standard for Reviewing Trial Court Fact-Findings in Criminal Cases*

Dismissing this case as improvidently granted leaves untouched the standard of review for criminal cases this Court articulated in *Reed v. State,* 291 Ga. 10, 13 (727 SE2d 112) (2012), and reiterated in *Morrell v. State,* 313 Ga. 247, 251 (869 SE2d 447) (2022):

16

> For evidentiary rulings, we accept a trial court's factual findings unless clearly erroneous and review a trial court's ultimate decision on the issue for an abuse of discretion. The clearly erroneous standard is equivalent to the highly deferential "any evidence" standard, which means we will not reverse a trial court's factual findings if there is any evidence in the record to support them.

*Morrell*, 313 Ga. at 251 (cleaned up) (citing *Reed*, 291 Ga. at 13).

But it impresses me as noteworthy—if not a bit unusual—that our Court has concluded that two standards that appear to be textually distinct (that is, the "any evidence" and the "clearly erroneous" standards) are the same for purposes of appellate review of trial court fact-findings in criminal cases. It is all the more unusual given that our Court typically ascribes meaning to differences in text, cf. *Florida Rock Indus., Inc. v. Clayton County Bd of Comm'rs*, 316 Ga. 380, 381 (888 SE2d 573) (2023) (Peterson, P.J., concurring) ("[A]s a matter of plain meaning, it is hard not to notice the difference in terms. 'Any evidence' seems to mean what it says, so "substantial evidence" would presumably have to mean something else. After all, we normally presume "that the legislature did not intend to enact meaningless language.") (emphasis omitted),

17

and the phrases "any evidence" and "clearly erroneous" do not by their plain language appear to signify the same type of review.

Assessing the correctness of this standard of review requires a brief review of how that standard developed in the first place. And as explained more below, I have more questions than answers when it comes to the evolution of Georgia's "any evidence"/"clearly erroneous" standard of review of trial court fact-findings in criminal appeals.

(a) *Application of a federal clearly-erroneous standard in motion-to-suppress cases in the 1970s.* In the 1970s, this Court began articulating a specific standard of review when reviewing a trial court's fact-findings in criminal cases.[4] We did so in a set of

---

[4] The Supreme Court of Georgia was founded in 1845. See Acts of 1845, 18. But it appears that for many decades, we seldom set out—at least in express terms—the standard by which we reviewed the factual findings of lower courts in criminal cases. One standard that we did apply fairly consistently was an "any evidence" standard when reviewing a trial court's denial of a motion for new trial on the basis that the verdict was unsupported by the evidence. See, e.g., *Carnes v. State*, 28 Ga. 192, 194 (1859) ("In criminal cases jurors are judges of the law as well as the fact. They have, upon a full charge upon the law of the case by the court, and upon hearing all the evidence, found the law and the facts against the plaintiff in error; the judge who heard the cause refused to grant a new trial. There is some evidence to sustain the

18

cases pertaining to motions to suppress. For the most part, however, the standard of review we applied in those cases was neither an "any evidence" type of review nor the type of "clearly erroneous" standard we now equate with it. Instead, we applied some version of a clearly-erroneous standard derived from federal case law. Specifically, in *Johnson v. State*, 233 Ga. 58, 58 (209 SE2d 629) (1974), in reviewing a trial court's factual findings regarding an "alleged confession made . . . during an in-custody interrogation by a law enforcement officer," we stated: "Factual and credibility determinations of this sort made by a trial judge after a suppression hearing must be accepted by

_____

verdict, and we will not, in such a case, disturb the judgment of the court below."); *Mathews v. State*, 104 Ga. 497 (30 SE 727) (1898) (explaining, where the defendant appealed the trial court's denial of his motion for new trial on the ground that, among other things, "the verdict . . . was without evidence to support it[,]" that "[i]t being the province of the jury to pass upon questions of fact, and to determine the truth when the evidence is conflicting; this court will not disturb their finding, which was approved by the trial judge, if there is any evidence to support it[]"); *Graham v. State*, 110 Ga. 251 (34 SE 210, 210) (1899) ("Though the testimony, which was conflicting, might have authorized a conviction of voluntary manslaughter, the verdict finding the accused guilty of murder was not without evidence to support it. This being so, and there being no complaint that any error of law was committed at the trial, no cause for reversing the judgment below appears."). But those cases, which generally focus on the deference afforded to jury verdicts, do not directly answer questions about the standard of review an appellate court should apply when reviewing a lower court's findings of fact.

appellate courts unless such determinations are clearly erroneous."[5]

Id.

To support that proposition, we cited no Georgia case. Instead,

we cited—without explanation or analysis—two federal cases: *Lego*

---

[5] Notably, we applied a different standard of review in *State v. Swift*, 232 Ga. 535, 536 (207 SE2d 459) (1974)—decided only months before *Johnson*—when we expressly applied the any-evidence standard to review a trial court's fact and credibility findings underlying its denial of a motion to suppress physical evidence:

> On motion to suppress evidence, the trial judge sits as the trier of the facts, hears the evidence, and his findings based upon conflicting evidence are analogous to the verdict of a jury and should not be disturbed by a reviewing court if there is *any evidence* to support it.

232 Ga. at 536 (cleaned up) (emphasis added).

> We further explained:
> The credibility of the witness is for the trial judge's determination. His judgment will not be disturbed by a reviewing court if there is *any evidence* to support it. Therefore, where there is a conflict in the evidence on the motion to suppress, the ruling of the trial court will be upheld where there is *any evidence* to authorize a finding in support of his order.

Id. (cleaned up) (emphasis added).

*Swift* appears to be the outlier—at least for a few decades—and I have found only two cases citing *Swift* for this standard of review. See *Orkin v. State*, 236 Ga. 176, 189 (223 SE2d 61) (1976) (explaining that "[w]here there is evidence to support the decision of a trial judge on motion to suppress evidence, that decision will not be disturbed on appeal" and concluding that "the facts authorized" the trial court's fact-findings) (citing *Swift*, 232 Ga. at 535)); *Tate v. State*, 264 Ga. 53, 54 (440 SE2d 646) (1994) (quoting *Swift*, 232 Ga. at 536, for the proposition that "[t]he trial judge 'hears the evidence, and his findings based upon conflicting evidence are analogous to the verdict of a jury and should not be disturbed by a reviewing court if there is any evidence to support it.'").

*v. Twomey*, 404 U.S. 477 (92 SCt 619, 30 LE2d 618) (1972), and *United States v. Watson*, 469 F2d 362, 365 (5th Cir. 1972). It is not at all clear to me how *Lego* articulates, or even supports, the type of clearly-erroneous standard for which we cited it; *Lego* is a federal habeas case in which the United States Supreme Court evaluated the standard by which a state must prove that a criminal defendant's confession is voluntary. See *Lego*, 404 U.S. at 489 (holding in relevant part that "the prosecution must prove at least by a preponderance of the evidence that the confession was voluntary. Of course, the States are free, pursuant to their own law, to adopt a higher standard."). In *Watson*, by contrast, the Fifth Circuit *did* state the standard of review we later set forth in *Johnson*—but did so without citing any legal authority for that proposition. See *Watson*, 469 F2d at 365 ("In passing on whether the government has shown admissibility by a preponderance, we must, of course, accept the factual determinations and credibility choices made by the trial judge unless they are clearly erroneous.").

Still lacking explanation for why we selected and applied a

21

standard derived from these federal cases,[6] we continued citing and relying on *Lego* and *Watson* (and their progeny) over the next two decades for the proposition that "[f]actual and credibility determinations of this sort made by a trial judge after a suppression hearing must be accepted by appellate courts unless such determinations are clearly erroneous." See, e.g., *Woodruff v. State*, 233 Ga. 840, 843 (213 SE2d 689) (1975) ("[T]he trial court's decision on questions of fact and credibility at a suppression hearing must be accepted unless clearly erroneous.") (citing *Lego*, 404 U.S. at 477; *Watson*, 469 F2d at 365; *Johnson*, 233 Ga. at 58)); *Gates v. State*, 244 Ga. 587, 590-591 (261 SE2d 349) (1979) ("Unless clearly erroneous, a trial court's findings as to factual determinations and credibility

---

[6] Our lack of explanation, and our reflexive importation of a federal standard, is all the more confounding against the backdrop of the Georgia General Assembly enacting in 1969 a predecessor to OCGA § 9-11-52, which provided in part that "[f]indings of fact shall not be set aside *unless clearly erroneous*, and due regard shall be given to the opportunity of the trial court to judge of the credibility of the witnesses." 1969 Ga. Acts, 645-647 (emphasis added). Of course, this statute—which is part of the Civil Practice Act— applies by its own terms only to civil cases. But it had been enacted for almost five years by the time we decided *Johnson*, and it is curious that in setting out a "clearly erroneous" standard of review in that case, we did not even take note of the existence of the clearly-erroneous standard that already existed for civil cases in Georgia.

22

relating to the admissibility of a confession will be upheld on appeal.") (citing *Watson*, 469 F2d at 365; *Johnson*, 233 Ga. at 58; and *High v. State*, 233 Ga. 153 (210 SE2d 673) (1974)); *Crawford v. State*, 245 Ga. 89, 90-91 (263 SE2d 131) (1980) ("Unless clearly erroneous, a trial court's findings as to factual determinations and credibility relating to the admissibility of a confession will be upheld on appeal.") (citing *Lego*, 404 U.S. at 477; *Watson*, 469 F2d at 365; and *Gates*, 244 Ga. at 587)); *Berry v. State*, 254 Ga. 101, 104 (326 SE2d 748) (1985) ("Unless clearly erroneous, a trial court's findings as to factual determinations and credibility relating to the admissibility of a confession will be upheld on appeal.") (citing *Gates*, 244 Ga. at 590-591; *Crawford*, 245 Ga. at 89)).

(b) *The standard of review began to evolve in the 1990s.* We added gloss to—and ultimately sowed confusion about—the standard of review for trial court fact-findings in criminal cases in *Tate v. State*, 264 Ga. 53, 54 (440 SE2d 646) (1994). In *Tate*, the defendant moved to suppress evidence of cocaine that was found in his vehicle during a traffic stop; the trial court granted the motion

to suppress; and the Court of Appeals reversed the trial court. Id.

at 53. In rejecting the Court of Appeals's reasoning, we articulated

certain "principles" that should "guide" an appellate court's review

of the trial court's factual findings on a motion to suppress:

> First, when a motion to suppress is heard by the trial judge, that judge sits as the trier of facts. The trial judge "hears the evidence, and his findings based upon conflicting evidence are analogous to the verdict of a jury and should not be disturbed by a reviewing court if there is any evidence to support it." *State v. Swift,* 232 Ga. 535, 536, 207 S.E.2d 459 (1974). Second, the trial court's decision with regard to questions of fact and *credibility* must be accepted unless clearly erroneous. *Woodruff v. State,* 233 Ga. 840, 844, 213 S.E.2d 689 (1975).

*Tate*, 264 Ga. at 54 (emphasis in original) (cleaned up).[7]

On one hand, we resurrected *Swift*—the pre-*Johnson* motion

to suppress case cited above in footnote in which we applied the any-

evidence standard of review—for the principle that a "reviewing

court" "should not . . . disturb[]" a trial court's "findings based upon

conflicting evidence . . . if there is any evidence to support it." *Tate*,

---

[7] We also stated a third principle that is less relevant to this discussion: that "the reviewing court must construe the evidence most favorably to the upholding of the trial court's findings and judgment." *Tate*, 264 Ga. at 54.

24

264 Ga. at 54 (quoting *Swift*, 232 Ga. at 536). We supported that conclusion by reasoning that when a "trial judge hears the evidence, and his findings [are] based upon conflicting evidence," they are "analogous to the verdict of a jury." *Tate*, 264 Ga. at 54 (quoting *Swift*, 232 Ga. at 536). And on the other hand, we explained that "the trial court's decision with regard to questions of fact and *credibility* must be accepted unless clearly erroneous." Id. (emphasis in original). In reaching that conclusion, we cited *Woodruff v. State*, 233 Ga. 840, 844 (213 SE2d 689) (1975)—a progeny of *Johnson* in which we applied a federally-imported clearly-erroneous standard in reviewing a trial court's factual findings. See *Tate*, 264 Ga. at 54.

With the announcement of these "principles," *Tate* created tension that is difficult to reconcile: within the same opinion, our Court purported to instruct appellate courts to review a trial court's findings of fact on a motion to suppress using both an any-evidence standard (a highly deferential standard) *and* a clearly-erroneous standard (also a deferential standard, but one that is generally less

25

so than the any-evidence standard). Specifically, *Tate*'s first "principle" instructs appellate courts to review trial courts' fact-findings in criminal motion-to-suppress cases under the any-evidence standard, whereas *Tate*'s second "principle" instructs appellate courts that a different set of findings—a trial court's "decision with regard to questions of fact and *credibility*"—"must be accepted unless clearly erroneous." See id. at 54 (emphasis in original).

It is hard to say what to make of *Tate*. Whether *Tate*'s treatment of the standards of review in that criminal case inadvertently conflated the any-evidence and clearly-erroneous tests in its first two "principles" or was instead an attempt to set out nuanced aspects of appellate review,[8] the case serves as an

---

[8] Reasonable minds could view *Tate* differently. For example, it may be that *Tate*'s first "principle" is more of an explanation of the deference typically afforded to jury verdicts (and analogs to it), rather than a recitation of a traditional standard of review an appellate court would apply to the factual findings a trial court made in the ordinary course of a case. But this imprecision—and the lack of clarity about how *Tate*'s first and second "principles" interact—is part of what has caused persistent confusion about the standard of review appellate courts should apply to a trial court's factual findings in criminal cases.

important marker because of the apparent confusion that followed. That confusion bears out in many of the hundreds of Georgia cases that have cited *Tate* for its standard of review "principles," but appear to conflate the any-evidence and clearly-erroneous standards or otherwise recite what appears to be a dual standard of review that makes it difficult to parse which standard this Court actually applied and whether the Court even viewed the two standards as distinct. See, e.g., *State v. David*, 269 Ga. 533, 535 (501 SE2d 494) (1998) ("In reviewing a trial court's decision on a motion to suppress, an appellate court must adopt the trial court's findings of fact unless they are clearly erroneous and not supported by any evidence admitted at the suppression hearing."); *State v. Thomas*, 275 Ga. 167, 168 (562 SE2d 501) (2002) (stating that "[a] trial court's findings of fact will not be deemed to be clearly erroneous if there is any evidence to support them" and holding that "the trial court's findings were authorized by the evidence in the record and are not clearly erroneous"); *Davis v. State*, 278 Ga. 305, 306-307 (602 SE2d 563) (2004) (explaining that "[a] trial court's findings of fact will not

27

be deemed to be clearly erroneous if there is any evidence to support them" and holding that "the trial court's findings were authorized by the evidence in the record and are not clearly erroneous"); *Brown v. State*, 278 Ga. 724, 726-727 (609 SE2d 312) (2004) (explaining, in ruling on a motion to suppress, that "the trial court sits as the trier of facts, and its findings regarding them are not disturbed on appeal if there is any evidence to support them; the trial court's decisions with regard to questions of fact and credibility must be accepted unless clearly erroneous, and a reviewing court construes the evidence most favorably to the trial court's findings[]") (citing *Tate*, 290 Ga. at 54); *Miller*, 288 Ga. at 287 (explaining that "[t]o properly follow the first principle, we must focus on the facts found by the trial court in its order, as the trial court sits as trier of fact[,]" and apply the clearly-erroneous standard to the trial court's "overt[]" credibility determination underlying a finding of fact in a suppression order) (citing *Tate*, 290 Ga. at 54) (emphasis omitted).

(c) *We set forth a single standard of review in 2012.* Against this backdrop, in 2012 we addressed in the context of a criminal case the

28

standard for appellate courts to apply when reviewing a trial court's factual findings. In that case, *Reed v. State*, 291 Ga. 10, 13 (727 SE2d 112) (2012), the defendant was convicted of murder (among other crimes) and contended that the trial court had erred in admitting similar-transaction evidence against him at trial. In the course of addressing a *different* standard—the standard for reviewing a trial court's admission of similar-transaction evidence— we stated:

> In Georgia, it is well-settled that the 'clearly erroneous' standard for reviewing findings of fact is equivalent to the highly deferential 'any evidence' test.

Id. at 13 (also distinguishing the "abuse of discretion" standard from the "clearly erroneous" standard, explaining that "'abuse of discretion' . . . is at least slightly less deferential than the 'any evidence' test," and deducing that the "abuse of discretion" standard is "different from and not quite as deferential as the 'clearly erroneous' test"). To support our characterization of this standard as "well-settled," we cited seven Georgia appellate cases—but no

criminal cases from this Court.[9]   And we articulated this standard

without reference to *Tate*, though in some sense we created an

amalgam of *Tate*'s first two "principles."[10]   We bolstered our

conclusion by re-examining language from a decades-old habeas

corpus case, *Balkcom v. Vickers*, 220 Ga. 345, 348 (138 SE2d 868)

(1964), and overruling it "to the extent that it implie[d] that, in

Georgia, the 'any evidence' rule differs from the 'clearly erroneous'

standard." *Reed*, 291 Ga. at 13.[11]

---

[9] Instead, we cited six civil appeals decided by this Court and one criminal appeal decided by the Court of Appeals. See *Patel v. Patel*, 285 Ga. 391, 392 (677 SE2d 114) (2009) (civil); *Delbello v. Bilyeu*, 274 Ga. 776, 777 (560 SE2d 3) (2002) (civil); *Turpin v. Todd*, 271 Ga. 386, 390 (519 SE2d 678) (1999) (habeas corpus); *Hall v. Ault*, 240 Ga. 585 (242 SE2d 101) (1978) (civil); *Brenntag Mid South v. Smart*, 308 Ga. App. 899, 902 (710 SE2d 569) (2011) (civil); *Shook v. State*, 221 Ga. App. 151, 152 (470 SE2d 535) (1996) (civil forfeiture); and *Jones v. State*, 146 Ga. App. 88, 90 (245 SE2d 449) (1978) (criminal).

[10] Notably, however, the standard we articulated in *Reed* did not address the standard of review for trial court credibility findings, which the second *Tate* "principle" did address.

[11] We stated that "[s]ometimes the appellate courts find it necessary to use more than one standard of review to evaluate a single trial-court ruling" and that "in various contexts, we accept factual findings unless they are clearly erroneous and review a trial court's ultimate decision on the particular issue for abuse of discretion." Id. at 13 (cleaned up).  We then applied that two-step approach in *Reed*, concluding that the trial court's findings regarding similar-transaction evidence were not clearly erroneous, and that the trial court did not abuse its discretion in its ultimate ruling that the similar-transaction evidence was admissible.  Id. at 14 (cleaned up).

30

Despite whatever shortcomings *Reed*'s reasoning may have had, see footnote 9, it seems clear that *Reed* attempted to eliminate any doubts or confusion that stemmed from, or lingered after, the decades of cases noted above in which this Court inconsistently applied the any-evidence and clearly-erroneous standards of review. And by expressly overruling Georgia cases "to the extent that [they] implie[d] that, in Georgia, the 'any evidence' rule differs from the 'clearly erroneous' standard," *Reed*, 291 Ga. at 13, *Reed* overruled more than just the offending portions of *Vickers*: it also had the effect of overruling, sub silentio, earlier cases from this Court to the extent such cases purported to apply a federal clearly-erroneous standard to a trial court's factual findings in criminal cases.[12]  See *Mobley v. State*, 307 Ga. 59, 75 n.20 (834 SE2d 785) (2019) (explaining how a decision of this Court can "amount[] to a *sub silentio* overruling" of

---

[12] See, e.g., *Johnson*, 233 Ga. at 58 (citing only to federal cases in applying the clearly-erroneous standard of review); *Woodruff*, 233 Ga. at 843 (citing only to federal cases and *Johnson*, 233 Ga. at 58, in applying the clearly-erroneous standard of review); *Crawford*, 245 Ga. at 90-91 (citing only to federal cases, *Hurt*, 239 Ga. at 665, and *Gates*, 244 Ga. at 587); *Berry*, 254 Ga. at 104 (citing to *Crawford*, 245 Ga. at 90-91 and *Gates*, 244 Ga. at 590-591).

an earlier case of this Court) (citation and punctuation omitted).

Why did we take this approach in *Reed*, relying almost exclusively on civil cases, to establish a standard of review in criminal appeals?  I am not sure, but I suspect it has something to do with the parallel and also-inconsistent development of standards of review in civil appeals.  See, e.g., Code § 81A-152 (1969) ("In all actions in Superior Court tried upon the facts without a jury, the court shall find the facts specially and state separately its conclusions of law thereon and judgment shall be entered . . . . *Findings of fact shall not be set aside unless clearly erroneous*, and due regard shall be given to the opportunity of the trial court to judge of the credibility of the witnesses.") (emphasis added); OCGA § 9-11-52 (1987) (succeeding Code § 81A-152; also setting forth a "clearly erroneous" standard of review for trial court fact-findings in civil cases).[13]  See also *Brook Forest Enters, Inc. v. Paulding County*,

---

[13] It is worth emphasizing that in civil cases, unlike in criminal cases, the General Assembly has codified a standard—"clearly erroneous"—for review of a trial court's factual findings.  See OCGA § 9-11-52 (a) (1987). Whether Georgia courts have correctly interpreted that statutory text in civil cases is not the subject of this concurrence.

231 Ga. 695, 695 (203 SE2d 860) (1974) (in a civil case, referencing the "clearly erroneous" language from Code § 81A-152 and then applying some version of an any-evidence standard); *Hall v. Ault*, 240 Ga. 585, 586 (242 SE2d 101) (1978) (in reviewing an administrative proceeding, construing the clearly-erroneous standard of review in the predecessor to OCGA § 45-20-9 (m)[14] as equivalent to an any-evidence standard and relying in part on *Brook Forest* to do so).

Why do I think that? Because *Hall v. Ault* is one of the handful of non-criminal cases we cited in *Reed* to support the proposition that "any evidence" equals "clearly erroneous" and "clearly erroneous" equals "any evidence" when an appellate court reviews a trial court's fact-findings in a criminal case. As best I can tell, it

---

[14] Georgia Code Ann. § 40-2207.1 (m) then said: "The review shall be conducted by the court without a jury and shall be confined to the record. The court shall not substitute its judgment for that of the board as to the weight of the evidence on questions of fact. The court may affirm the decision or order of the board or remand the case for further proceedings. The court may reverse the decision or order of the board if substantial rights of the petitioner have been prejudiced because the board's findings, inferences, conclusions, decisions or orders are: . . . (4) Clearly erroneous in view of the reliable, probative, and substantial evidence on the whole record . . . ." This provision is now codified at OCGA § 45-20-9 (m).

seems that *Reed* borrowed from a line of non-criminal cases—including *Brook Forest* and *Hall*—to erase the distinction, if any, between the any-evidence and clearly-erroneous standards of review of trial court factual findings in the criminal context.

Whatever our motivation and (unexplained) reasoning was in articulating the singular "clearly erroneous"/"any evidence" standard in *Reed,* our Court has been applying that standard for a dozen years in criminal appeals. We doubled down on that standard, citing *Reed*, only two years ago in *Morrell v. State*:

> For evidentiary rulings, we accept a trial court's factual findings unless clearly erroneous and review a trial court's ultimate decision on the issue for an abuse of discretion. The clearly erroneous standard is equivalent to the highly deferential "any evidence" standard, which means we will not reverse a trial court's factual findings if there is any evidence in the record to support them.

*Morrell v. State*, 313 Ga. 247, 251 (869 SE2d 447) (2022) (citing *Jordan v. State*, 305 Ga. 12, 17 (823 SE2d 336) (2019); *Reed*, 291 Ga. at 13. And we continue to apply that standard in criminal cases today. See, e.g., *Pierce v. State*, S24A0525, 2024 WL 4350982 (Ga. Oct. 1, 2024).

34

4. *Conclusion*

I had hoped that this case would present an opportunity to determine an appropriate framework or set of principles for determining the proper standard for appellate review of fact-findings in criminal cases. But the parties here have not offered a persuasive theory on that front. And as shown above, my efforts have generated more questions than answers. Without anything approaching certainty as to the right set of principles for determining the appropriate standard of review in this context, I see no basis for revisiting that question.

In the meantime, *Reed*'s emphatic rejection of the notion that the any-evidence standard differs from the clearly-erroneous standard, as well as this Court's continued application over the past decade of the standard *Reed* articulated, shows that *Reed*'s standard of review for a trial court's findings in criminal cases remains intact today. Georgia law is thus clear—at least at present, and in the criminal context—that we "accept a trial court's factual findings unless clearly erroneous" and "[t]he clearly erroneous standard is

equivalent to the highly deferential 'any evidence' standard, which means we will not reverse a trial court's factual findings if there is any evidence in the record to support them." *Morrell*, 313 Ga. at 251. See also *Reed*, 251 Ga. at 13.

I am authorized to state that Justice Pinson joins in this concurrence.