**THIRD DIVISION**
**DOYLE, P. J.,**
**MARKLE and PADGETT, JJ.**

**NOTICE: Motions for reconsideration must be *physically received* in our clerk's office within ten days of the date of decision to be deemed timely filed.**
**https://www.gaappeals.us/rules**

**September 18, 2025**

# In the Court of Appeals of Georgia

A25A0954. BRADFORD v. STATE OF GEORGIA.

DOYLE, Presiding Judge.

In this interlocutory appeal, Dunn Terrious Bradford challenges the denial of his motion to suppress evidence obtained in a civil forfeiture proceeding[1] against his property, which was seized pursuant to an investigation against him for commercial gambling and possessing and manufacturing a controlled substance.[2] Bradford contends that the search of his property was based on a warrant obtained pursuant to

---

[1] See generally *Tuggle v. State*, 224 Ga. App. 353, 355 (3) (480 SE2d 353) (1997) ("[A] claimant in a civil forfeiture action may challenge the legality of an underlying search when the validity of the search has not been previously adjudicated in a criminal action[.]").

[2] The property included real property, two rifles, a shotgun, a handgun, ammunition, and cash.

an illegal prior search of his property using a drone. We affirm because the record supports the trial court's determination that the warrant was predicated on a source of probable cause independent of the drone flight.

> When reviewing the grant or denial of a motion to suppress, an appellate court must construe the evidentiary record in the light most favorable to the trial court's factual findings and judgment. Moreover, an appellate court generally must accept the trial court's factual findings unless they are clearly erroneous,[3] and also generally must limit its consideration of the disputed facts to those expressly found by the trial court. Although we owe substantial deference to the way in which the trial court resolved disputed questions of material fact, we owe no deference at all to the trial court with respect to questions of law, and instead, we must apply the law ourselves to the material facts.[4]

---

[3] See generally *Capote v. State*, 320 Ga. 191, 207 (4) (908 SE2d 540) (2024) (Warren, J., concurring) (offering a historical perspective about the standards of review applied in Georgia criminal cases, including those reviewing a ruling on a motion to suppress, and concluding that "at least at present, and in the criminal context[,] . . . the clearly erroneous standard is equivalent to the highly deferential 'any evidence' standard, which means we will not reverse a trial court's factual findings if there is any evidence in the record to support them") (punctuation omitted), citing *Reed v. State*, 291 Ga. 10, 13 (3) (727 SE2d 112) (2012) ("In Georgia, it is well-settled that the 'clearly erroneous' standard for reviewing findings of fact is equivalent to the highly deferential 'any evidence' test.").

[4] (Citations and punctuation omitted.) *Westbrook v. State*, 308 Ga. 92, 96 (2) (839 SE2d 620) (2020).

So viewed, the record shows that on February 15, 2024, a Mitchell County Sheriff's Department investigator received a call from the sheriff, who had received a call from a "concerned citizen." The caller reported a noise complaint due to a large group of dogs constantly barking at a property on Pinewood Lane. Approximately seven residences are located along the road, and based on the call, the investigator "went and met with a guy that lives right down the road and got permission to get on his property. [The investigator] flew [a] drone over the tree line of the property and observed a large amount of dogs in a wooded area in the back of the residence" at 600 Pinewood Lane, where Bradford lives. Using the drone's camera, the investigator saw "approximately 40 to 50" dogs on the property. He was not able to discern their condition, and he pursued no further investigation or criminal action at that time.

A week later, on February 22, 2024, the sheriff received a second call from a neighbor on the same street stating that "one of the dogs had gotten loose and come up to their property and he looked malnourished." Based on this, the investigator contacted the county code enforcement officer to conduct a welfare check regarding the loose dog. The investigator testified that, "when we rode down [Pinewood Lane], we didn't observe any dogs at any of the other residences until we got to the end and

3

observed" two dogs in the front yard of Bradford's property. The two dogs were visible from the road, and one dog was confined in a small cage similar to a rabbit cage, and the other dog was attached to a heavy logging chain. The caged dog was "almost bigger than the cage it was in," such that its confinement appeared inhumane. Also audible from the road was the sound of a large number of dogs barking from the back of Bradford's property.

Based on the two dogs visible from the road, the investigator and code enforcement officer approached the residence, and they could see that the two dogs appeared mistreated and malnourished, lacking evidence of adequate food, water, and shelter. They could also hear the barking of "a tremendous amount of dogs" coming from the back of the property. Having observed the condition of the two dogs and noting their living situation as "inhumane," the investigator and code enforcement officer followed the sound of barking to a wooded area at the rear of the property, where they saw approximately 67 dogs tied to chains. The dogs appeared mistreated, malnourished, and poorly housed. The dogs' collars were bolted on so that they could not be removed without a tool; one dog was so entangled with its chain that it took 30

minutes to disentangle it. The investigator and code enforcement officer made no contact with Bradford at that time.

In light of the grim scene, the investigator determined that he would seek a warrant to search for evidence of crimes pertaining to animal cruelty. After obtaining the search warrant, police discovered contraband leading to Bradford's indictment for drug crimes, dog fighting, cruelty to animals, firearm violations, and commercial gambling, as well as the forfeiture of property involved in this appeal.

In defense of this forfeiture action, Bradford moved to suppress the items found pursuant to the search warrant, arguing that the warrant was predicated on the illegal drone flight that led the investigator to visit his property with the code enforcement officer. Following a hearing at which the investigator and code enforcement officer testified, the trial court denied the motion to suppress, explaining: "The Court listened to the evidence very closely, and [t]he Court believes that the search warrant is based on information that started strictly at the second telephone call on February the 22nd, and that it did not relate to or have any relation to the prior drone flight or information from the drone and the drone flight. . . ."

Bradford now appeals, contending that the investigator's in-person visit to his residence after the February 22 call was based on the investigator's prior knowledge of the large number of dogs observed in the drone flight. He argues that the drone flight was an illegal search, so any further investigation occurring as a result of that flight, including the decision to visit his property with the code enforcement officer, must be suppressed.[5] We disagree.

As a threshold matter, we assume without deciding that the drone flight that observed Bradford's property was an unauthorized search without a warrant.[6] So the question before us is whether the warrant that authorized the search of Bradford's home was based on an independent source of probable cause, such that the warrant was not derived from the drone flight.[7]

---

[5] See generally *McNeil v. State*, 362 Ga. App. 85, 92 (866 SE2d 249) (2021) ("[E]vidence . . . discovered by exploitation of the violation of [a defendant's] Fourth Amendment rights . . . is therefore inadmissible as the fruit of the poisonous tree."). (punctuation omitted).

[6] The trial court did not definitively resolve the legality of the drone flight, stating only that the drone flight "may not have constituted an illegal search," based on its height and the characteristics of the property.

[7] See generally *Tatum v. State*, 319 Ga. 187, 195 (2) (903 SE2d 109) (2024) ("[I]f the State would have sought the warrant even without the prior illegality, then its decision was not prompted by the prior unlawful search.").

In general, the independent source doctrine "operates when evidence discovered as the result of an initial unlawful search is later discovered in a second search conducted by lawful means using information gained independently of the initial search."[8] Georgia has adopted a two-part test for administration of the independent source doctrine:

> The first part of the test requires courts to excise from the search warrant affidavit any information gained during the alleged illegal entry and determine whether the remaining information supports a finding of probable cause. . . If, after excising information regarding unlawfully obtained evidence from the warrant affidavit, the remaining evidence is sufficient to support a finding of probable cause, courts reach the second part of the test, in which they must determine whether the officer's decision to obtain a search warrant was prompted by what he observed during the illegal entry. . . This is a mixed question of fact and law.[9]

(a) *The search warrant application did not include information from the drone flight, and probable cause was supported by other information.* Here, the affidavit in the warrant application contained the following facts:

---

[8] *Wilder v. State*, 290 Ga. 13, 16 (2) (717 SE2d 457) (2011).

[9] (Punctuation omitted.) *Tatum*, 319 Ga. at 192-195 (2).

7

One male dog p[e]nned in a small enclosure by itself on the ground, 45 to 50 dogs chained to the ground with logging chains, puppies in other small enclosures. Most dogs had no signs of water in concrete-made water bowls with the concrete being bone dry. Several dogs had no adequate shelter with some dogs having a blue or black . . . 55 gallon drum, while others did not. There were several dogs with signs of scarring on their bodies and faces. Maltreatment with rib cage showing with no signs of food on the ground or in bowls around the dogs. There was also dog bones in the wooded area near the dogs.[10]

Thus, the warrant affidavit did not mention the drone flight or any information gleaned from the drone flight. The warrant affidavit merely described the scene encountered by the investigator and code enforcement officer during their in-person visit to Bradford's residence a week later. That information, which was not discernable from the drone flight, presented evidence of animal cruelty[11] and illegal

---

[10] This information was recounted by the investigator at the hearing.

[11] See OCGA § 16-12-4 (defining misdemeanor and felony cruelty to animals offenses).

dogfighting,[12] which provided probable cause to issue a warrant to investigate those activities.[13]

(b) *The decision to seek a warrant was based on the in-person visit, not the drone flight.* The next question is whether the investigator was prompted to seek the warrant based on the drone flight imagery. The investigator testified that after the drone flight, no further investigation ensued. He explained that he conducted the in-person visit a week later only because of the call from a neighbor on the street about the loose dog, which was unrelated to the earlier noise complaint that prompted the drone flight. While responding to the loose dog complaint with the code enforcement officer, the investigator saw no other evidence of dogs associated with the approximately seven other residences on the street, and before they entered Bradford's property, they were able to hear a large number of dogs barking from the back of his property and they

---

[12] See OCGA § 16-12-37 (defining felony and misdemeanor dogfighting offenses).

[13] See generally *Hutchins v. State*, 374 Ga. App. 830, 838 (3) (c) (914 SE2d 364) (2025) ("[A] magistrate's task in determining if probable cause exists to issue a search warrant is simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, . . . there is a fair probability that contraband or evidence of a crime will be found in a particular place.") (punctuation omitted).

were able to see two dogs in his front yard, one confined inhumanely. At this point, the investigator had independently (and legally) learned the same information provided by the drone flight — there was a large group of dogs behind Bradford's property. Thus, as stated by the investigator, his decision to approach Bradford's residence was prompted by the scene and sounds observable from the road in response to the complaint about a loose dog.

The investigator's decision to approach the residence was authorized because viewing "objects within the plain view of an officer who is in a lawful position" to view them is not a Fourth Amendment violation, and the officer's view of Bradford's front yard from the street was not a violation of Bradford's privacy.[14] Further,

> [w]here a police officer enters upon private property only to the extent of knocking on outer doors, the Fourth Amendment is not violated. [And] if police utilize normal means of access to and egress from the house for some legitimate purpose, . . . [as they did here], it is not a Fourth Amendment search for the police to see or hear or smell from that vantage point.[15]

---

[14] (Punctuation omitted.) *Cupe v. State*, 327 Ga. App. 642, 646 (1) (760 SE2d 647) (2014).

[15] (Citations and punctuation omitted.) Id. The large group of dogs was found in a wooded area "behind a shop at the back of the property." On appeal, Bradford

Based on the investigator's testimony, the trial court was authorized to find that he was not led to Bradford's residence, nor did he seek the warrant, based on the drone footage. "[A]ppellate courts must focus on the facts found by the trial court *in its order*, as the trial court sits as the trier of fact."[16] And because the facts as found by

_____

does not argue that the wooded area was within the curtilage of his home or that the investigator and code enforcement officer violated his Fourth Amendment right by entering it. Nor did he make this argument in his written motion to suppress or at the suppression hearing. See generally *Corey v. State*, 320 Ga. App. 350, 353 (1) (739 SE2d 790) (2013) ("[E]ven if officers have probable cause to investigate a crime, without a warrant, exigent circumstances, or proper consent, they may not enter a home or its curtilage."). The trial court stated that the wooded area "may or may not have been considered curtilage," but "there was testimony that the area of the multiple dogs' location . . . was not visible from Pinewood Lane, was wooded in nature, and was an apparent trek" from the front yard. In light of the lack of findings by the trial court, and the lack of argument by Bradford before the trial court and on appeal, we do not address whether the officers violated Bradford's Fourth Amendment rights by moving from the front of the house to the sound of a large group of barking dogs in the woods at the back of the property. See *Bryant v. State*, 288 Ga. 876, 894 (13) (b) (708 SE2d 362) (2011) (failure to raise argument in motion to suppress waives the argument on appeal); *Massey v. State*, 350 Ga. App. 427, 430 (2) (a) (827 SE2d 921) (2019) (same); *Locher v. State*, 293 Ga. App. 67, 68-69 (1) (666 SE2d 468) (2008) ("[I]n challenging a trial court's denial of a motion to suppress, a defendant may not argue on appeal grounds that he did not argue and obtain a ruling on below.") (punctuation omitted).

[16] (Punctuation omitted; emphasis in original.) *Caffee v. State*, 303 Ga. 557, 559 (1) (814 SE2d 386) (2018), quoting *Hughes v. State*, 296 Ga. 744, 746 (1) (770 SE2d 636) (2015).

the trial court were supported by the record, we accept those findings.[17] Accordingly, we hold that the trial court did not err by denying Bradford's motion to suppress.

*Judgment affirmed. Markle and Padgett, JJ., concur.*

---

[17] There was a discrepancy between the testimony of the investigator and the code enforcement officer regarding whether they reported to the street based on a missing dog or a welfare check. But it was for the trial court to resolve this discrepancy as the fact finder. See *Hughes*, 296 Ga. at 747 (1).